(C. D. 1356)

E. Dillingham, Inc. *v.* United States

United States Customs Court, Third Division

(Decided July 31, 1951)

*Barnes, Richardson & Colburn* (*Eugene F. Blauvelt* of counsel) for the plaintiff.
*David N. Edelstein,* Assistant Attorney General (*Joseph E. Weil* and *Richard F. Weeks,* special attorneys), for the defendant.

Before Cline, Ekwall, and Johnson, Judges

Johnson, Judge: This case involves the classification of cows imported for breeding purposes. The cattle were entered at the port of Ogdensburg, N. Y. Entry 877 covered 19 cows imported for dairy purposes upon which duty was paid at 1½ cents per pound under the provisions of paragraph 701, Tariff Act of 1930, as amended by the General Agreement on Tariffs and Trade, T. D. 51802, and 1 purebred Jersey cow, imported for breeding purposes. Entry 887 covered 13 cows imported for dairy purposes, upon which duty was paid under paragraph 701, as amended, and 1 purebred Jersey cow and 2 purebred Holstein-Friesian cows imported for breeding purposes. The purebred cattle were entered under the duty-free provisions of paragraph 1606 (a) of the Tariff Act of 1930, as amended by T. D. 51887. The entries were liquidated free of duty as entered on July

18, 1949. However, the collector pursuant to section 521 reliquidated the entries on April 12, 1950, on the ground that there was probable cause to believe there had been a fraud against the Government. The reliquidations involved only the one Jersey purebred cow covered by entry 877, and the one Jersey and two Holstein-Friesian purebred cows covered by entry 887. Protests were filed against such reliquidations.

The provisions of the Tariff Act of 1930 or that act, as amended, so far as applicable, are as follows:

SCHEDULE 7.—AGRICULTURAL PRODUCTS AND PROVISIONS

| Par. No. | Description | Modified rate |
|---|---|---|
| 701 | Cattle: <br> \*     \*     \*     \*     \* .     \*     \* <br> Weighing 700 pounds or more each: <br>      Cows imported specially for dairy purposes_____ <br> [Rate modified by T. D. 51802.] | <br><br><br><br> 1½¢ per lb. |

SCHEDULE 16.—FREE LIST

PAR. 1606. (a) Any animal imported by a citizen of the United States specially for breeding purposes, shall be admitted free, whether intended to be used by the importer himself or for sale for such purposes, except black, silver, or platinum foxes, and any fox which is a mutation, or type developed, therefrom: *Provided,* That no such animal shall be admitted free unless pure bred of a recognized breed and duly registered in a book of record recognized by the Secretary of Agriculture for that breed: *Provided further,* That the certificate of such record and pedigree of such animal shall be produced and submitted to the Department of Agriculture, duly authenticated by the proper custodian of such book of record, together with an affidavit of the owner, agent, or importer that the animal imported is the identical animal described in said certificate of record and pedigree. *The Secretary of Agriculture may prescribe such regulations as may be required for determining the purity of breeding and the identity of such animal:* [Italics not quoted.] *And provided further,* That the collectors of customs shall require a certificate from the Department of Agriculture stating that such animal is pure bred of a recognized breed and duly registered in a book of record recognized by the Secretary of Agriculture for that breed.

(b) The Secretary of the Treasury may prescribe such additional regulations as may be required for the strict enforcement of this provision.

    \*       \*       \*       \*       \*       \*       \*

[Tariff Act of 1930, as amended by T. D. 51887.]

SEC. 521. RELIQUIDATION ON ACCOUNT OF FRAUD.

If the collector finds probable cause to believe there is fraud in the case, he may reliquidate an entry within two years (exclusive of the time during which a protest is pending) after the date of liquidation or last reliquidation.

## TITLE IV—ADMINISTRATIVE PROVISIONS

SEC. 483.  CONSIGNEE AS OWNER OF MERCHANDISE.

For the purpose of this title—

(1)  All merchandise imported into the United States shall be held to be the property of the person to whom the same is consigned; and the holder of a bill of lading duly indorsed by the consignee therein named, or, if consigned to order, by the consignor, shall be deemed the consignee thereof.  The underwriters of abandoned merchandise and the salvors of merchandise saved from a wreck at sea or on or along a coast of the United States may be regarded as the consignees.

(2)  A person making entry of merchandise under the provisions of subdivision (h) or (i) of section 484 (relating to entry on carrier's certificate and on duplicate bill of lading, respectively) shall be deemed the sole consignee thereof.

The Regulations of the Department of Agriculture, Bureau of Animal Industry, promulgated under authority of paragraphs 1606 (a), *supra*, for determining the purity of breeding and the identity of such animals, are as follows:  (See Code of Federal Regulations, 1949 edition, title 9, chapter I, 1950 supplement, pages 34–35, in force at the time of importation of the animals in question.)

### CERTIFICATION OF PUREBRED ANIMALS

§ 151.2  *Issuance of certificates of pure breeding.*  The Bureau will issue certificates of pure breeding for animals claimed to be entitled to free entry under the act upon compliance by the importer with the requirements of the regulations in this part.  Such certificates will be issued to the collector of customs at the port of entry of such animals.

§ 151.3  *Application for certificates of pure breeding.*  Application for certificates of pure breeding executed by the importer of the animals or his agent may be made to the Bureau after customs entry has been made, on forms furnished or approved by the Bureau, showing the surname of the importer and his given name, or initials, if any; the address (in the United States) of the importer; the number, breed, and sex, and port and date of arrival of the animals imported; the customs entry number of the importation; and the name of the vessel or other carrier by which shipped.

§ 151.4  *Pedigree certificates.*  Pedigree certificates for the animals listed in § 151.10, issued by the custodian of the appropriate book of record listed in said section, shall be furnished by the importer or his agent to the inspector at the time of examination of the animals as provided in § 151.8.  Following examination of the animals, the importer or his agent shall present the pedigree certificates to the Bureau at the time of making application for certificates of pure breeding as provided in § 151.3.  The Bureau will later return the papers to the party who submitted them.  A verbatim translation of the description relating to color and markings shall appear in English in the pedigree certificate for each animal or in a separate certificate appended to the pedigree certificate.

§ 151.5  *Transfers of ownership.*  A complete record of transfers of ownership, from the breeder to and including the United States importer, of animals for which certificates of pure breeding have been requested shall be furnished to the Bureau by the importer or his agent.  Such transfers shall have been

recorded on the pedigree certificates by the registry association or on certificates of transfer issued and approved by the registry association.

\*   \*   \*   \*   \*   \*   \*

§ 151.7 *Affidavit of identity.* An affidavit by the owner, agent, or importer, duly acknowledged before an officer having authority to administer oaths, stating that the animals declared for free entry under the act are the identical animals described in the pedigree certificates, shall be furnished to the Bureau by the importer or his agent.

At the trial counsel for the Government asked an opportunity to establish through an examination of witnesses that the collector had proper cause to believe that there was a fraud committed against the Government. The first witness was Martin J. Holden, assistant collector of customs at the port of Ogdensburg.

The witness testified that the entry papers indicated to him that the merchandise was acquired as a result of a purchase transaction rather than as merely on consignment; that he liquidated the entry free of duty on the theory that M. R. Levin & Sons was the owner upon the basis of the entries and the certificates of pure breeding issued by the Department of Agriculture; and that he did not know that M. R. Levin & Sons was not the owner until he received a report of the customs agent. The witness testified that the affidavits of identity for animals for breeding purposes were never submitted to the collector but are sent directly to the Secretary of Agriculture. The collector only inspects the Canadian certificate of pure breeding accompanying each animal. He also admitted that the invoices upon which he permitted entries to be made were in proper form; that the invoices neither stated that the cattle were sold to nor consigned to M. R. Levin & Sons; that there is no indication on the invoices as to the nature of the transactions between the Canadian shipper and M. R. Levin & Sons; and that the declaration of the nominal consignee on the back of the printed entry forms is the one always employed by a broker when he is acting as a nominal consignee, irrespective of whether the goods are consigned or are on an outright sale to the ultimate consignee.

The following colloquy took place between the judge on circuit and the witness:

JUDGE COLE: Mr. Holden, assuming without of course holding, that there was actual fraud perpetrated by the importer in this case, is it your position that the initial fraud is to be found in the preliminary proceedings of the Department of Agriculture in order to obtain the certificate?

WITNESS: Yes.

JUDGE COLE: Is it because of that alleged fraud in obtaining the papers from the Department of Agriculture which came to your attention subsequently that you placed the construction on it that it was fraudulent?

WITNESS: That's right, my position is that the Department of Agriculture would not have issued the pure breeding certificate if they had known the true facts.

JUDGE COLE: Giving the Department of Agriculture the benefit of the facts which you say to be true as against the facts which you claim are contrary, you don't know whether the Department of Agriculture agrees with you or not; whether the affidavit should be withdrawn or stand.

WITNESS: No, I do not. I was basing my decision or action rather, on the Court decision which Mr. Weil quoted.

Counsel for the Government for purposes of sustaining the reliquidation for fraud also examined the nominal consignee, C. Edward Dillingham, the plaintiff of record and the broker entering the animals in question. He testified that as a nominal consignee he never uses the form on the back of the consumption entry reading—

Declaration of Consignee or Agent for Merchandise Obtained otherwise than in pursuance of a Purchase or Agreement to Purchase.

He testified that such form is used only in cases where he wishes to be relieved from the additional or increased duties provided for in section 485 (d). The witness stated that Mr. Levin purchased some of the purebred cattle in question, but he knew nothing about any memo agreement between Mr. Levin and the Canadian shippers, and if he had known of any such agreement, he would still have used the first form, the declaration of the nominal consignee, which states his position. In all of his 25 years' experience he has never used the form cited above.

As to the proper cause for invoking the provisions of section 521, *supra*, the Government and the plaintiff rested. The Government then moved to dismiss the protests upon the ground that there was a failure to comply with section 485 (d) of the Tariff Act of 1930. Decision on the motion was reserved by the court. From a consideration of the evidence adduced the motion is denied.

Respecting the merits of the case, counsel for the plaintiff called Abel Levin, partner of the firm of M. R. Levin & Sons, and Archie R. Dawson, the assistant director of the Canadian National Livestock Records.

Mr. Levin testified substantially as follows: He is a citizen of the United States and in the business of buying and selling cattle, having cattle pens at his place of business and facilities to hold auctions. He dealt in Canadian purebred dairy cattle as well as United States cattle for the past 25 years. He is familiar with the rules and regulations governing the registering of purebred stock, and is a life member of the Holstein Association of America.

Mr. Levin with Walter Brigham, also a citizen of the United States, and an officer of the Massachusetts Farm Federation, went to Canada

to meet Arthur J. Hudson of the Eastern Cooperative of Lynn, Ontario. The purpose of the trip was to purchase cattle and also to have cattle consigned for sale. With Mr. Hudson, various cattle farmers were visited. Arrangements were made for the Jersey, called "Avondale," to be brought to the United States on consignment. To the best of his knowledge, the Jersey, called "Leeds Blond Vallory," was purchased by him personally. One of the Holstein-Friesian cows was purchased for his own account but the other was acquired on consignment. He advanced the funds for the blood tests, transportation, etc., of all the cows, and for the purchase of the stock he personally acquired. The sum involved was nearly a thousand dollars, and it was given to the representative of the Eastern Cooperative, who arranged for the transportation of the cattle to the United States.

After the cows were delivered to his place in Lunenberg, Mass., he fed, watered, and cared for them, and "got them ready" for a sale advertised by the Massachusetts Farm Bureau. He was paid for such service by the Bureau and, upon the sale of such cattle as were brought in on consignment, he was paid 4 per centum commission per head. A representative of the Bureau was present at the sale and handled all the money. The two cows personally purchased by him were also sold at the auction and the Massachusetts Farm Bureau also received the proceeds, retaining 1 per centum thereof as a commission and returning the remainder.

Mr. Levin saw the Canadian certificates of pure breeding of the four cows in question and knew that his firm name appeared thereon as owner. He stated that when an animal is transferred, it is naturally understood that it is to the next owner and that it was in that capacity the name appeared. In other words, he was the owner of record. It is not possible to register a Canadian-bred cow in an American association with the Canadian certificate of breeding, and, therefore, before being registered in the United States, the one seeking to so register it has to appear as the owner on the Canadian record of pure breeding. After the cows were sold by his firm, they were all registered with the name of the new owners, and he, as seller, was required to issue the transfer of ownership.

Mr. Levin testified on cross-examination that his firm acted as agent of the Massachusetts Farm Bureau but his company was to bear all of the expense until after the sale for the reason that neither the Massachusetts organization nor the Canadian cooperative had any money. The Canadian association did not bear the expense of the transfer and registration. The witness failed to recall what he had stated to Customs Agent Donahue because that agent came to interrogate him just as the sale was about to start; that there were from a thousand to twelve hundred people there and he was quite excited, and therefore could not remember what he said.

Mr. Dawson testified that he was the assistant director of the Canadian National Livestock Records, an affiliate of all of the purebred livestock organizations in Canada; that the function of the organization is the registration of purebred livestock; that the organization is governed by the Livestock Federal Act, Act of Parliament; and that he has been in the office of the organization for 40 years and has held the particular position of assistant director for 14 years. Consequently, he is familiar with the registration of purebred cattle in all of its phases.

According to the witness, the ownership of the "dam" of the animal at the time it is born is shown on the certificate of registration as the owner of record and the breeder. The association does not attempt to determine who holds the legal title to a registered animal and makes no distinction between an unconditional sale and a consignment for sale, and, therefore, the registration papers do not distinguish between the legal owner and an owner who only has rightful possession; that when one comes into possession of a purebred animal, legal possession or ownership of that animal is recorded by securing an application for transfer of ownership from the seller, and if one wishes to continue breeding that animal, it is necessary to have the name of the new possessor substituted in the records of the association in place of the previous owner. When a cow is so registered, with any subsequent change of ownership, there must be a transfer of that certificate. And the same form of application for transfer of ownership is used in all cases where the physical possession of the cow is transferred from one man to another, irrespective of whether legal title passes or not. The date on the pedigree certificate shows a transfer of ownership which does not necessarily mean an unconditional sale, and would include consigned cattle. The witness testified that such a state of facts had been true during his entire experience.

Mr. Dillingham, the broker, was recalled by the Government. He testified that the secretary of his company signed the applications for certificates of pure breeding and after being so signed they are filed directly with the Department of Agriculture. Copies of the applications were marked in evidence as exhibits 2 and 3. With reference to the words "owned by" on the applications, the witness stated that he obtained his information which caused him to fill in the name "M. R. Levin & Sons" from the Canadian pedigree certificates. In all such cases, the owner is obtained in such manner, and the instructions in regard to making applications for certificates of pure breeding set out in some detail just how these forms should be filled out, particularly that "they shall be filled out exactly as to spelling, corporate names, exactly as they appear on the pedigree certificate." The witness further testified that he had made and supervised the entry of many purebred cows imported for breed-

ing purposes for the last 25 years and was quite familiar with the rules and regulations of the Department of Agriculture as applicable to the importation of purebred cows for breeding purposes. In making out the applications for certificates, he makes no special inquiry as to the nature of the transaction, and he did not know that Mr. Levin was going to sell the cattle.

Mr. Levin was recalled by the Government for further testimony. He testified that two meetings were held with the Massachusetts Farm Bureau and he was perfectly aware that the cattle were to come to his place of business and that he was to receive them as a consignee and was to sell them for the Farm Bureau of Massachusetts, for which he would receive a commission. He also admitted that he was well aware of the fact that the declaration form for free entry is an affidavit taken under oath that "the animals are imported by me especially for breeding purposes."

It was agreed between counsel for both sides that the cows in question were imported to be sold for breeding purposes.

The plaintiff contends that the reliquidations and the assessments of duty thereunder are illegal and void because no fraud was committed. Inasmuch as there was no false or fraudulent statement made, nor was there any intent to defraud upon the importation and entry of the purebred cattle, the collector had no authority to reliquidate the entries under the provisions of section 521, *supra*.

It is further contended that even though it be held that the collector was authorized to reliquidate the entries under authority of section 521, *supra*, by reason of the fact that he had probable cause to believe there was a fraud, the assessment of duty was contrary to law because the purebred cows, in fact, are entitled to free entry under paragraph 1606, *supra*. In that regard, it is argued that paragraph 1606 does not require that a purebred animal imported for breeding purposes by a citizen of the United States be owned by such citizen at the time of importation, and that it scarcely can be conceived that Congress intended to make purebred cows imported for sale to American farmers for breeding purposes dutiable merely because the United States citizen importing them did not hold an unconditional legal title to all of the cows he imported.

The Government contends that the collector predicated his reliquidations upon the report of customs agents indicating that the consignee of the cows was not the actual owner, whereas the entry papers indicated to the collector that the transaction was one of purchase, and whereas, as a matter of fact, the importations were merely "a business transaction and not an importation for breeding purposes." It is argued that the erroneous statements on the applications and the incorrect affidavits on the entries resulted in misleading the collector and, therefore, upon learning the correct facts,

he had probable cause to believe fraud had been committed and the right accrued to reliquidate the entries under the provisions of section 521, *supra*.

Counsel for the Government further argues that the importer must have the intent and purpose, at and before the importation, to use the animals for the purpose of breeding; and that there was no intent or purpose in the case at bar to so use the cows, as at no time from the trucking of the cows to the auction sale was there any indication that breeding was the purpose of the project. The only acts performed were to sell the cows. As the Levin brothers knowingly made out false affidavits alleging that the animals were imported for breeding purposes and that they were the owners, it is contended the collector properly reliquidated the entries and legally assessed duty upon the cows in question.

The first question before the court is whether or not the collector was justified in reliquidating the entry under the provisions of section 521, *supra*. The second question is whether or not the cows in question were properly entitled to free entry under the provisions of paragraph 1606 (a). Of course, a finding that the collector did not have probable cause to suspect fraud and consequently that the reliquidations were illegal and void brings into operation the provisions of section 514 that after 60 days, liquidations of collectors shall be final and conclusive for all parties.

The evidence discloses that the collector bases his action in reliquidating upon a decision of the court. The timely report of the collector filed with the papers discloses that his decision remained unchanged upon review because the importer was not the owner, citing T. D. 46113, which has reference to the case of *C. S. Emery & Co.* v. *United States*, 20 C. C. P. A. 340. That case also involved the importation of Canadian purebred cattle. The Canadian shipper, Gale, sold cattle to Crowley, a resident of the United States, but not a citizen. Gale's hired man, Wylie, was an American citizen. In order to escape the payment of duty upon the cattle, Gale had Wylie truck the cattle in to Crowley and enter them in his, Wylie's own name, as the consignee and importer. To that end, the cattle were transferred to Wylie and he entered them as animals imported by a citizen of the United States specially for breeding purposes. After importation, he transferred the cattle to Crowley, but in payment he received a note from Crowley payable to Gale, not to Wylie. The court found that at no time did Wylie have any title to the cattle or control over their disposition. The appellant there contended that the cattle were consigned to Wylie and, therefore, no inquiry could properly be made as to the real ownership, relying upon section 483, Tariff Act of 1922, predecessor to the present section 483, in support of that position.

The court did not inquire into the question of whether or not the provisions of section 483, Tariff Act of 1922, were applicable to the situation but, nevertheless, vouchsafed the opinion that the provisions of that section "do not control the construction of said paragraph 1506 [predecessor to the present paragraph 1606], because so to hold would nullify the plain intent of Congress in the enactment of said paragraph." No explanation by the court was given as to the manner in which the paragraph would become a nullity. Judge Garrett, however, dissented from that view.

The court held, however, that the privilege of free importation is limited to citizens of the United States, and Congress never intended that mere "dummies, such as Wylie was, might be used by an owner of cattle to secure the privilege of exemption of duty." The court found that Wylie had no intention of either using the cattle himself or selling them for breeding purposes, and that the real importer of the cattle was a Canadian citizen, to wit, Gale.

That case is not on all fours with the situation now before the court. Here, M. L. Levin & Sons was the *bona fide* consignee of the cattle. It was not acting as a "dummy." It not only put up the money to purchase some of the cattle in question but also paid the transfer fees and transportation. The evidence fully establishes that there was nothing wrong with the form of invoice, nor with the manner in which the transfer of ownership was made upon the Canadian certificate of pure breeding. The transfer of ownership to consignees of cattle had been the rule for at least 25 years and was always used in the ordinary course of business. The cattle were imported by a citizen of the United States for sale for breeding purposes, in accordance with statutory authority. The Government cannot repudiate, as attempted in brief of counsel, the agreement between counsel that the animals were imported for breeding purposes.

Paragraph 1606, *supra*, provides that any animal imported by a citizen of the United States specially for breeding purposes, shall be admitted without the payment of duty when for sale for such purpose. The proviso is that such animal shall be pure bred of a recognized breed and duly registered, and a certificate of such registry shall be submitted to the Department of Agriculture, together with an affidavit of either of three persons, the owner, the agent, or the importer, which is sufficiently clear so as to identify the animal described in the certificate of record and pedigree. It will be particularly noted that the affidavit is not to the effect that the owner must be identified. It is solely for the purpose of identifying the animal.

Also, the permission given the Secretary of Agriculture, it will be observed, was to prescribe regulations for the purpose of determining the purity of the breeding and the identity of the animal, and was not for the purpose of identifying the owner. Referring to these regula-

tions, first, it is the importer who is required to comply with the regulations. The application must be issued by the importer or his agent, showing the surname of the importer and his given name, or initials, his address in the United States, and identifying data concerning the animal. The pedigree certificates are required to be furnished by the importer or his agent, not the owner, and the affidavit of identity is for the purpose of identifying the animals declared for free entry and not the owner, and such affidavit may be taken by either the owner, agent, or the importer.

As for the ownership, there is required a complete record of transfers of ownership from the breeder right up to and including the United States importer which shall have been recorded on the pedigree certificates by the registry association or on certificates of transfer issued and approved by the registry association.

The evidence fully establishes that all of these regulations have been meticulously complied with. The importer of the cattle appears upon the pedigree certificates as the person to whom the breeder has transferred the cattle. In exhibits 1 and 2, the affidavits of identity for the animals in question, the importer swears under oath that the cattle are identical with those described in the pedigree certificates. True, in making such declaration, he designates the animals as "belonging to me" but he is not swearing that he is the actual legal owner thereof, but that they have been given to him in trust and are in his possession. The Customs Regulations of 1943, so far as applicable, provide for filing, in connection with the entry of purebred animals for breeding purposes, an affidavit showing that the *importer* is a citizen of the United States and that the animals are imported specially for breeding purposes. If it were contemplated that section 483, *supra*, was not applicable to animals imported under paragraph 1606, the regulations would require that an affidavit be furnished to establish that the *owner* is a citizen of the United States rather than the importer.

Dawson's testimony clearly establishes that the statement of ownership contained in the Canadian pedigree certificates indicated the one possessing the animal; that it had left the possession of the breeder and came into the possession of the importer· who was a citizen of the United States; and that it is plain that such had been the practice for over 25 years.

In the case of *Lafontan* v. *Elting, Collector of the Port of New York et al.*, 54 F. (2d), 664, a suit was brought against the collector of customs for the value of certain lambskins imported from France. The consignee of the merchandise was the American Import & Export Corp., also made the defendant. The merchandise had been shipped under a straight bill of lading made out to the American Import & Export Corp. The bill of lading was delivered to the shipper, J. B. Arbouet, but he sent an invoice to the American Import & Export

Corp., who went to the collector, presented the invoice, and, after execution of the necessary documents, entered and obtained possession of the goods on filing an indemnity bond to produce the bill of lading. The plaintiff was the assignee of J. B. Arbouet, the importer of the merchandise, and produced the bill of lading in court unindorsed. Proof was also submitted that the consignee had not paid the invoice.

The court pointed out that in section 483 "all merchandise imported into the United States shall, for the purposes of this title, be held to be the property of the person to whom the same is consigned," and observed that such had been the law since 1799, pointing out that the object of the provision was to prevent frauds upon the Government arising from collusive transfers, and that delivery to the consignee without production of a bill of lading was not such a misdelivery for which the collector could be held liable in damages.

In T. D. 45614, the Commissioner of Customs stated that section 483 and section 485 (d) of the Tariff Act of 1922, as well as the corresponding sections of the Tariff Act of 1930, fixed the ownership of imported merchandise in the consignee, and specifically designated who shall be considered the consignee, and inasmuch as there is no other provision of law dealing with the question of ownership of imported merchandise for customs purposes no one other than the consignee as defined in the statutes mentioned is entitled to recognition as the owner thereof.

In the case of in re *Amicus Van Steenberge*, 14 Treas. Dec. 463, T. D. 28595, G. A. 6689, involving horses imported by a citizen of the United States specially for breeding purposes under the act of 1897, where the collector had refused to grant free entry because the transaction between the Canadian owner and the importer had been carried on a credit basis, and the importer was merely to receive a commission for making the importation and the sale of the animals, the court stated:

It is a well-settled principle that a verbal contract for the sale of personal property is valid, and that the sale is completed when the seller, by actual delivery or other unequivocal act, intentionally passes the title of the property to the purchaser, whether the price is fixed by agreement or is left to be adjusted by future stipulation of the parties to the contract. In our opinion, the evidence shows a sale of the animals in question fully completed by delivery to the purchasers.

We are convinced from the evidence that the transactions involved in this action were *bona fide* and that the collector did not have probable cause to believe there was fraud in the case. The facts were insufficient to warrant the collector's reliquidations of the entries under the provisions of section 521, *supra*, even if the *dicta* of the court in the *Emery* case, *supra*, were considered applicable here, to the effect that the provisions of section 483, *supra*, were confined only

to the purposes of title IV, the provisions there would, nevertheless, apply to section 521, under which the reliquidations were made. Thus, if the cows are to be regarded as the property of the consignee as owner under the law, there were no lawful reasons given by the collector for suspecting fraud and, therefore, said reliquidations are illegal.

In the case of *E. Dillingham, Inc.* v. *United States*, 3 Cust. Ct. 245, C. D. 245, a similar situation arose where the customs agent conducted an investigation after an entry involving the importation of livestock under the provisions of paragraph 1606 (a) for the purpose of selling for breeding purposes, and the collector, after the time had expired under the provisions of section 514 and the reliquidation had become final and conclusive as against all persons, had reliquidated the entry under the provisions of section 521 for fraud. The court found that the facts of the case did not warrant the collector's reliquidating the entry under section 521, and held that the reliquidation was void and that the duties collected thereunder should be refunded.

Following the decision in that case, it is the holding of this court that the reliquidations of April 12, 1950, are invalid and that any duties collected by reason thereof should be refunded.

Judgment will be entered accordingly.