(C. D. 1756)

CAREY & SKINNER, INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided January 25, 1956)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*Warren E. Burger,* Assistant Attorney General (*William J. Vitale* and *Henry J. O'Neill,* trial attorneys), for the defendant.

Before EKWALL and JOHNSON, Judges

JOHNSON, Judge: This case involves four stallions imported from Canada on or about October 4, 1950, and entered as horses for breeding purposes, exempt from duty under paragraph 1606 (a) of the Tariff Act of 1930, as amended by chapter 173 of the laws of 1948 (62 Stat. 161). The entry was liquidated free of duty as entered on January 23, 1951. However, pursuant to section 521 of said tariff act, the collector reliquidated the entry on November 9, 1951, on the ground that there was probable cause to believe that the entry was fraudulent. The horses were assessed with duty at 15 per centum ad valorem under paragraph 714 of said tariff act, as modified by the General Agreement on Tariffs and Trade, T. D. 51802. Protest was timely filed against said reliquidation.

When the case was called for trial, counsel for the plaintiff moved for an order to vacate and set aside the reliquidation of November 9, 1951, on the ground that it was "invalid, improper, unwarranted, illegal, null and void." Counsel claimed that the original liquidation was final and conclusive upon the United States under section 514 of the Tariff Act of 1930; that no facts were alleged upon which the collector could base a belief that there was fraud; that section 521 was not applicable; that the reliquidation was invalid, because the collector did not make a specific finding of probable cause to believe there was fraud; that the importer, prior to reliquidation, was not given a hearing; and that, therefore, the collector's action was without due process of law. In support of the motion, counsel moved in evidence the official papers in the case, including the invoice, entry, summary sheet, and consumption entry permit; the certificate of inspection and the certificate of pure breeding, issued by the Department of Agriculture; and the declaration of free entry of animals for breeding purposes.

The entry was made by Carey & Skinner, Inc., the plaintiff herein, for the account of George E. Collins, Waterloo, N. Y. According to the declaration of nominal consignee on the back of the consumption entry, Collins was the actual owner of the merchandise for customs purposes. The invoice states that the four stallions were purchased by Collins and shipped by J. Keith Lamb, Caledonia, Ontario. The price of each is given as $250, and the animals were entered at that value. The certificate of pure breeding states that the animals were standardbred horses, registered in the "Canadian Standard Bred Stud Book." Collins is named as the importer. Collins, in a declaration sworn to October 10, 1950, states that he is a citizen of the United States and that the animals were imported by him for breeding purposes.

Counsel for the Government asked that decision on plaintiff's motion to set aside the reliquidation be reserved for the full division. He then stated that he would "proceed to submit evidence in an attempt to sustain the action of the collector."

For this purpose, the Government called James W. Polk, an agent of the United States Customs Service. He testified that he had been asked to make an investigation of the facts surrounding this importation and, in connection therewith, he, together with Customs Agent David F. Cardoza, had interviewed J. Keith Lamb, a horse breeder and the shipper of the involved horses, at Caledonia, Ontario. The witness did not identify himself to Lamb as a United States Customs agent, but asked him if he had horses for sale. Lamb said he had two stallions which he wished to sell and that he intended to sell them at the Batavia auction in 1951, if not sold before. He told the witness he would take $650 for one, if bought in Canada, or $700 if delivered in the United States. The witness testified that the following statements were made in connection with the four horses involved in this case:

* * * I stated in substance that I understood he had sold horses at the Batavia Raceway auction prior to that time and he stated that he had; that in 1950 he had sold four stallions, yearlings, for which he had received an average of $900 per animal.

Q. Did he say that he sold those animals through——A. No, sir; he stated that they were sold at auction for him.

Q. Did he say who he shipped them to?—A. They were shipped to Mr. Collins.

* * * * * * *

Q. Did he say that he made any arrangement with Mr. Collins as to how to enter these horses?—A. No, sir; he did not. He did not state that he had made any arrangement with Mr. Collins. However, I asked him a question about the United States customs, how I could get the horses into the country without paying the 15 percent duty. And he stated that it had been his practice to enter them for breeding purposes, in which case duty was avoided. And I advised him that

were I to buy horses in all likelihood I wouldn't use them for breeding purposes; that I might use them for racing or I might use them as saddle horses. And he stated that that was immaterial; that the United States Customs Service never checked up on these horses after they came in on the ultimate use of the horses.

Q. Did you ask him what happened to the proceeds of the sale of the horses that he sent to Mr. Collins in 1950?—A. Not a direct question, no, sir. He stated that he had received an average of $900 each for those horses.

The witness Polk testified that, on August 9, 1951, he and Customs Agent Cardoza interviewed Collins at the Batavia Raceway, identifying themselves as customs agents. According to the witness, Collins stated that he was a United States citizen and that he was in partnership with James Brown, doing business under the name of Western Standardbred Horse Sales Co.[1] He described the operation of the company to the witness as follows: The profits of all sales, except the sales of horses sent into the United States by Brown, are equally divided between Collins and Brown. A 5 per centum commission is charged on the sale of animals consigned for sale at auction, with the exception of the sale of animals entered by Brown. The funds received are deposited in a joint account maintained by Collins and Brown. Collins told the witness that Lamb's horses had been sold at auction and that, prior to the sale, an announcement was made that the horses were breeders.

At the conclusion of this testimony, counsel for the plaintiff renewed its motion to set aside the reliquidation, and, after the court reserved decision, called George E. Collins as a witness. Collins stated that he was a citizen of the United States residing at Waterloo, N. Y., and had been buying and selling horses for about 30 years. In connection with the four stallions in question, he testified that a man brought them over in a truck and he (Collins) signed some papers. He said he imported the animals for breeding purposes; that they were in very nice condition and had a pedigree on the father's side; and that they had never raced.

Collins stated that Lamb had brought the horses and turned them over to him, and he made them ready for the sale. The arrangement between them was for the payment to Collins of $5 apiece for cataloging and 5 per centum commission. Collins sold the horses at the Batavia sale in October 1950, and he and Lamb announced that they were being sold for breeding purposes only. Collins said that Lamb was right there, doing all the talking and telling about the qualities of the horses.

Collins stated that, at the time of the sale, he had title to the horses, but he did not pay for them until 4 days after the sale. He said that the entry papers, showing that the merchandise was imported for his account and that he was the actual owner, were correct. He

[1] Collins testified later that the name of the company was Western New York Horse Sales Co.

had signed the declaration that the horses were imported by him specially for breeding purposes.

On cross-examination, Collins stated that one of the horses was sold for $800 and one for $400 at the sale, but he did not remember what the other two brought. He thought they averaged about $700. Collins said he never kept any record of the sale, because all he received was 5 per centum for selling them and $5 per head for cataloging. The purchasers at the sale got the horses and Lamb the proceeds, less the commission and cataloging charge.

At a subsequent hearing, counsel for the plaintiff stated that Mr. Collins had died on June 1, 1954. Customs Agent Polk was recalled as a witness and stated that he had no recollection of asking Lamb at the time of the original investigation whether he was a Canadian citizen.

The chief question before the court is whether or not the collector was justified in reliquidating the entry under the provisions of section 521 of the Tariff Act of 1930. Said section provides:

If the collector finds probable cause to believe there is fraud in the case, he may reliquidate an entry within two years (exclusive of the time during which a protest is pending) after the date of liquidation or last liquidation.

Under a prior statute, which provided that the settlement of duties should, after 1 year, in the absence of fraud, be final and conclusive on all parties (18 Stat. 190), it was held that the collector's finding of fraud was not conclusive nor was the burden of disproving fraud cast upon the importer. *United States* v. *Sherman & Sons Company*, 237 U. S. 146; *F. Vitelli & Son* v. *United States*, 250 U. S. 355. In the case last cited, the Court pointed out that the remedy to be accomplished by the statute was to circumscribe the power to reliquidate to the instances specified, in order that uncertainties as to the finality of customs entries might be removed. It found that the lower court, in holding that there was a presumption that the collector acted within his power, was in error, since such a presumption would virtually remove the limitation which the statute created in the exercise of the power and that placing the burden of proof on the protestant negatived the remedial purposes of the statute. It concluded that the result of such construction would be "to cast upon the citizen the perpetual burden of showing that he had not been guilty of wrong as the only means of escaping the exercise against him of the unlimited power to reliquidate which it was the purpose of the statute to prevent."

That reasoning is also applicable to the construction of the present statute. In *United States* v. *Waterbury Lock & Specialty Co.*, 35 C. C. P. A. (Customs) 131, C. A. D. 384, the court stated (pp. 137–138):

The law is well settled that where the collector reliquidates an entry on the ground of fraud, his action in so doing is not presumptively correct to the extent of requiring the importer to assume the burden of disproving the fraud. *F. Vitelli & Son* v. *United States*, 250 U. S. 355.

We conclude that, in the instant case, there rested upon the Government the burden of proving that the collector had probable cause to believe there was fraud. *Pacific Brokerage Co.* v. *United States*, 3 Cust. Ct. 20, C. D. 193; *Geo. Wm. Rueff, Inc.* v. *United States*, 20 Cust. Ct. 72, C. D. 1087; *E. Dillingham, Inc.* v. *United States*, 27 Cust. Ct. 109, C. D. 1356.

Paragraph 1606 (a) of the Tariff Act of 1930, as amended, under which this merchandise was entered, provides:

(a) Any animal imported by a citizen of the United States specially for breeding purposes, shall be admitted free, whether intended to be used by the importer himself or for sale for such purposes, except black, silver, or platinum foxes, and any fox which is a mutation, or type developed therefrom: *Provided*, That no such animal shall be admitted free unless pure bred of a recognized breed and duly registered in a book of record recognized by the Secretary of Agriculture for that breed: *Provided further*, That the certificate of such record and pedigree of such animal shall be produced and submitted to the Department of Agriculture, duly authenticated by the proper custodian of such book of record, together with an affidavit of the owner, agent, or importer that the animal imported is the identical animal described in said certificate of record and pedigree. The Secretary of Agriculture may prescribe such regulations as may be required for determining the purity of breeding and the identity of such animal: *And provided further*, That the collectors of customs shall require a certificate from the Department of Agriculture stating that such animal is pure bred of a recognized breed and duly registered in a book of record recognized by the Secretary of Agriculture for that breed.

In other words, free entry is limited to purebred animals of a recognized breed, imported by a citizen of the United States, for use or sale for breeding purposes, provided that certain certificates of record and pedigree are produced and submitted to the Department of Agriculture and a certificate of pure breeding is issued by said Department.

In the instant case, the merchandise was so entered and the required documents duly filed. In order to establish that there was probable cause to believe there was fraud in the case, the Government must show that the animals were not imported by a citizen of the United States, or were not purebred, or were not imported for breeding purposes.

There is no evidence that the horses herein were not purebred or that they were not imported for sale for breeding purposes. There is no evidence that they were not, in fact, used for such purposes. It is the intent of the importer at the time of importation that is controlling rather than the disposition of the animals after entry. *E. Dillingham (Inc.)* v. *United States*, 57 Treas. Dec. 547, T. D. 43957; *E. Dillingham, Inc.* v. *United States*, 3 Cust. Ct. 245, C. D. 245.

Although there is a discrepancy between the value of the horses given on the invoice and the prices at which they were said to have been sold, it has been held that any question as to the purchase price or valuation of animals imported for breeding purposes is immaterial, since the statute permits free entry of animals imported for such purposes. *E. Dillingham, Inc.* v. *United States, supra.*

The Government relies upon the contention that Collins, the importer of record, was not the owner of the stallions, but was an agent of Lamb, and that Lamb was a Canadian citizen and could not enter the animals free of duty.

Under paragraph 1506 of the Tariff Act of 1922 (the predecessor of paragraph 1606 (a), *supra*), it was held that the exemption was limited to citizens of the United States and that mere dummies might not be used by owners of cattle to secure the privilege of free entry. *C. S. Emery & Co.* v. *United States*, 20 C. C. P. A. (Customs) 340, T. D. 46113. In that case, cattle were imported by appellant for one Wylie, who was the consignee. Wylie was a United States citizen in the employ of one Gale, a Canadian. Gale had sold the cattle to one Crowley, also a Canadian, but living in New Hampshire. At no time did Wylie have title to the cattle or control over their disposition, his connection with the importation being solely for the purpose of taking advantage of said paragraph 1506. Under those circumstances, the court held that the merchandise was not entitled to free entry.

On the other hand, in *E. Dillingham, Inc.* v. *United States*, 27 Cust. Ct. 109, C. D. 1356, it was held that purebred cattle, imported by a United States citizen upon consignment for sale for breeding purposes, were entitled to free entry under paragraph 1606 (a), *supra*. In that case, M. R. Levin & Sons appeared on the papers as the owner of the merchandise, but some of the cattle had been acquired on consignment. The firm paid transfer fees and transportation and got the cattle ready for a sale advertised by the Massachusetts Farm Bureau. The firm was paid for such service by the bureau and received a 4 per centum commission on the sale. The court found that the firm was a *bona fide* consignee and was not acting as a "dummy" and that there was nothing wrong with the form of invoice nor the manner in which the transfer of ownership was made upon the Canadian certificate of pure breeding. It held that the collector did not have probable cause to believe there was fraud and that the reliquidation under section 521 was void.

The recent case of *Carey & Skinner, Inc.* v. *United States*, 33 Cust. Ct. 48, C. D. 1634 (appeal dismissed December 10, 1954), involved the importation by a citizen of the United States of horses, purchased at a guaranteed price for consignment to a partnership, which, in turn, consigned them for sale at auction. The animals had been entered

free of duty under paragraph 1606 (a), *supra*, and, thereafter, the entry was reliquidated by the collector on the ground of fraud. The court held the reliquidation void, stating (p. 58):

The documentary evidence, as well as the oral evidence, fully establishes that Mr. Collins had sufficient title to the horses to consign them to the sale and also sufficient to transfer unconditional title to the purchasers. It is established that Mr. Collins was the owner of record of the horses at the time of importation and that it was his purpose to import the horses for purposes of sale for breeding. It is entirely immaterial whether or not his ownership was a complete ownership, a conditional ownership, or an ownership based on consignment. Mr. Collins, it is clear, did not import the horses for the exclusive use of any person not a citizen of the United States. He paid for the animals with his own money, and, for all that appears, he had the exclusive control of the disposition thereof. An importer who is an American citizen, having the lawful possession of imported animals imported for breeding purposes, as evidenced by a complete record of transfers of ownership from the breeder to himself, which shall have been recorded on the pedigree certificates, approved by the registry association, may rightfully claim exemptions from duty under the provisions of paragraph 1606 (a) when imported for the purposes there set out.

At the time of the reliquidation herein, the collector had before him the official papers naming Collins as the importer and the results of the investigations of Customs Agent Polk. Polk had been informed by Lamb that the four stallions had been shipped to Collins and had been sold at auction for Lamb at the Batavia Raceway for an average of $900 each. He had also heard that it was Lamb's practice to enter horses for breeding purposes to avoid payment of duty. Polk had no recollection of asking Lamb about his citizenship. Polk had been told by Collins that the horses had been sold for breeding purposes and that his firm charged a 5 per centum commission on the sale of animals consigned for sale at auction.

This evidence is not sufficient to establish that the collector had probable cause to believe there was fraud. At the time Lamb was interviewed, he thought Polk was a purchaser of horses, and it was natural for him to exaggerate the prices at which he had previously sold his animals and to minimize the necessity of paying duty, if horses were imported for other than breeding purposes. The evidence shows that the horses involved herein were shipped by Lamb to Collins and were, in fact, sold at auction for breeding purposes, and it was so announced before the animals were actually offered for sale. Lamb's statement that they were sold "for him" and Collins' description of the operation of his company indicate that the horses may have been consigned to Collins for sale at the auction. That fact would not bar the entry of the animals under paragraph 1606 (a), as amended, nor justify the collector in finding fraud. *E. Dillingham, Inc.* v. *United States*, 27 Cust. Ct. 109, C. D. 1356.

In the instant case, moreover, while it appears that Lamb was a horse breeder of Caledonia, Ontario, there is nothing to show he was

either a citizen or a resident of Canada. On this record, it cannot be presumed that he was a citizen of Canada. *Cf. Shelton* v. *Tiffin*, 6 How. 163; *Ex parte Delaney*, 72 F. Supp. 312, affirmed in 170 F. 2d 239. Even if Collins were acting as Lamb's agent in this transaction, as the Government contends, and Lamb were the actual owner of the horses, the animals were entitled to free entry, if Lamb were a United States citizen. The collector did not know and the Government has not shown that he was not.

Nor does the record establish that Collins was merely a dummy. He did have an interest in the transaction. According to his testimony, Lamb turned the horses over to him to sell; he got them ready for the sale and paid for them after the sale. The proceeds of the sale, less 5 per centum commission and $5 a head, were paid to Lamb. In effect, Collins was either a conditional owner of the stallions or had an interest in them as consignee to sell them at the auction. The statute does not require that the animals be *owned* by a United States citizen but that they be *imported* by such citizen.

There is among the official papers which have been offered in evidence a certificate of pure breeding, issued by the Department of Agriculture. Under the regulations in effect at the time of importation (Code of Federal Regulations, title 9, ch. I, secs. 151.1 and 151.2), such certificate could not be issued without evidence of a complete record of transfer of ownership from the breeder to and including the United States importer. Since Collins is recorded as the importer on the certificate, evidence of a transfer of ownership to him must have been presented.

In our view, the facts and circumstances herein are similar to those involved in *E. Dillingham, Inc.* v. *United States*, 27 Cust. Ct. 109, C. D. 1356, and *Carey & Skinner, Inc.* v. *United States, supra*, wherein it was held that the importer, who was in one case the consignee and in the other the conditional owner of the merchandise, was entitled to enter it free of duty under paragraph 1606 (a), as amended, *supra*.

For the reasons stated and following the decisions cited, we hold that the reliquidation of November 9, 1951, is invalid, since the collector was not justified in invoking section 521, *supra*. Pursuant to the provisions of section 514 of the Tariff Act of 1930, the original liquidation of January 23, 1951, has become final and conclusive on all parties.

Plaintiff's motion to set aside the reliquidation of November 9, 1951, is granted. Judgment will be entered in favor of plaintiff, directing the collector to refund all duties collected under the said invalid reliquidation.