(C.D. 2150)

ARTHUR J. HUMPHREYS ⎫
M. W. SCHENK           ⎬ *v.* UNITED STATES

United States Customs Court, Third Division

(Decided February 11, 1960)

*Lawrence & Tuttle (Barnes, Richardson & Colburn* by *Edward N. Glad* of counsel) for the plaintiffs.

*George Cochran Doub,* Assistant Attorney General (*Murray Sklaroff* and *Sheila N. Ziff,* trial attorneys), for the defendant.

Before JOHNSON, DONLON, AND RICHARDSON, Judges

JOHNSON, Judge: This is a protest against the collector's assessment of duty on 24 purebred registered Holstein cows imported from Canada on June 14, 1957, at 1½ cents per pound under paragraph 701 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802. It is claimed in the protest that the animals are entitled to free entry under paragraph 1606(a) of said tariff act, as amended by Public Law 475, 80th Congress, second session, 62 Stat. 161, as animals imported by a citizen specially for breeding purposes.

The pertinent provisions of the tariff act provide:

PAR. 701 [as modified by the General Agreement on Tariffs and Trade, T.D. 51802]. Cattle weighing less than 200 pounds each or 700 pounds or more each, 1½¢ per lb.

PAR. 1606 [as amended by 62 Stat. 161]. (a) Any animal imported by a citizen of the United States specially for breeding purposes, shall be admitted free, whether intended to be used by the importer himself or for sale for such purposes; except black, silver, or platinum foxes, and any fox which is a mutation, or type developed, therefrom; *Provided,* That no such animal shall be admitted free unless pure bred of a recognized breed and duly registered in a book of record recognized by the Secretary of Agriculture for that breed: *Provided further,* That the certificate of such record and pedigree of such animal shall be produced and submitted to the Department of Agriculture, duly authenticated by the proper custodian of such book of record, together with an affidavit of the owner, agent, or importer that the animal imported is the identical animal described in said certificate of record and pedigree. The Secretary of Agriculture may prescribe such regulations as may be required for determining the purity of breeding and the identity of such animal: *And provided further,* That the collectors of customs shall require a certificate from the Department of Agriculture stating that such animal is pure bred of a recognized breed and duly registered in a book of record recognized by the Secretary of Agriculture for that breed.

This merchandise was entered as dutiable under paragraph 701 at 1½ cents per pound or free under paragraph 1606(a). It is stated on the entry:

All above pure bred Cattle imported specially for breeding purposes or export in part from the United States. Claimed duty free under 1606(a).

At the trial, there was received into evidence the declaration of the importer (plaintiffs' exhibit 1), which states:

I, M. W. Schenk, declare that I am a citizen of the United States; that the animals covered by the annexed entry are imported by me specially for breeding purposes; and that the same are identical with those described in the certificate of pedigree presented therefor. I further declare that none of the animals are intended for exportation from U.S.A.

A certificate of purebreeding covering these cattle was also received into evidence (plaintiffs' exhibit 2).

At the trial, Merle Walker Schenk, the importer, testified that he has been a livestock dealer for more than 30 years, dealing mainly in registered and unregistered cattle. Registered cattle are sold for breeding purposes, he said, and unregistered cattle for commercial purposes, such as the production of milk. He personally purchased the cattle involved herein in Canada and determined that the animals were registered. He stated that he imported them for resale for breeding purposes; that, in fact, three of them were sent to a consignment sale in Los Angeles, where they were sold for breeding purposes, but one was slaughtered because it proved to be a nonbreeder, and the balance were sent to Peru. The witness explained that he had a contract with Peru to supply it with 300 head of registered animals, to be selected by a representative of the Agricultural Bank of Peru, said selection to be made at the place or places where the cattle were pastured in this country. The contract was filled by the exportation of American cattle except for those involved herein. The witness stated that it was not his intent to sell any Canadian cattle with this order, but that he had no alternative.

On cross-examination, Mr. Schenk testified that at the time of importation he intended to resell the cows to anyone who was interested in buying them, including the Peruvian Government. He stated that he buys on speculation and tries to find a buyer afterwards; that he is only interested in selling to someone who will give him a good price. When asked whether he knew for what purpose the ultimate buyer would use the cattle, he said:

Well, it is commonly known if you pay more for an animal for breeding purposes it will be used for that purpose.

The witness also testified that on two occasions when he had a definite order, one for shipment to Japan and one to Mexico, the cattle were entered into the United States in transit, in bond, and were properly handled at the point of export from this country.

Arthur J. Humphreys, customs broker, testified that his office prepared the consumption entry involved herein. He explained that it was made out in the alternative for the following reason:

At the time that these cattle arrived at the Port of Lynden we received a phone call from Mr. Lundvall, who was Mr. Schenk's, I imagine, the former supervisor, and in this conversation he wanted us to hurry up the certificates of registration, because they needed them so they might be exported. So that put us on notice there could be a question about it.

Q. What sort of a question?—A. A question as to the ultimate destination of the cattle.

The witness explained that in November 1951 he had been instructed by the collector that cattle imported by a citizen specially for breed-

ing purposes could not be exported. Therefore, this entry was made out in the alternative to avoid any question of misstatements in the entry.

It is clear from this record that the cattle involved herein were imported by a citizen of the United States; that the animals were purebred of a recognized breed and duly registered in a book of record recognized by the Secretary of Agriculture; and that a certificate of purebreeding and an affidavit of the importer were submitted to the collector.

The question before us is whether the cattle were imported to be sold specially for breeding purposes within the meaning of the statute, in view of the fact that most of them were not sold or used for breeding purposes in this country but were exported to Peru and that the evidence indicates that at the time of importation the importer had some intention of allocating them to the Peruvian contract.

Under a predecessor of the statute before us, section 2505 of the Revised Statutes, it was provided that animals specially imported for breeding purposes should be admitted free upon proof thereof satisfactory to the Secretary of the Treasury. It was held under this section that the Secretary could not require that before free entry was allowed the collector must be satisfied that the animals were of superior stock adapted to improving the breed in the United States. *Morrill* v. *Jones*, 106 U.S. 466.

Subsequent to this decision, it was provided in the Tariff Act of 1890 (paragraph 482) that no animal should be admitted free for breeding purposes unless purebred of a recognized breed and duly registered in a book of record established for that breed and unless a certificate of such record and of the pedigree were produced.

A similar provision in the Tariff Act of 1897 (paragraph 473) was involved in *In re Page*, 7 Treas. Dec. 502, T.D. 25140, appeal dismissed, 9 Treas. Dec. 202, T.D. 26041, suit 1578. The court held that the statute did not restrict importation to citizens or inhabitants of the United States nor did it prohibit the sale of such animals after importation. In the course of the opinion, the court stated (p. 503):

* * * The manifest object of the law is to assist farmers and stock raisers in the United States in the production *within the United States* of the best breeds of livestock. Except in the comparatively few instances of wealthy stock fanciers, those who require breeding animals cannot afford to import them. The[y] must buy of others who can make a profit by importing animals for sale, and Congress, by omitting words expressing an intent to restrict the right of free importation to the few who can afford to import animals for their personal use, acted advisedly. [Emphasis supplied.]

Subsequent to this decision, paragraph 473 of the Tariff Act of 1897 was amended by Public Law 148, 57th Congress, second session, 32 Stat. 1023, to provide:

Any animal imported by a citizen of the United States specially for breeding purposes shall be admitted free, whether intended to be so used by the importer himself or for sale for such purpose:

The provisos requiring that the animal must be purebred and registered and that a certificate of record and pedigree must be submitted were not changed and similar provisions have been included in all subsequent tariff acts.

In *United States* v. *196 Mares*, 29 Fed. 139, the court pointed out that the words "specially imported for breeding purposes" meant for the particular purpose of breeding, and in *Amicus Van Steenberge* v. *United States*, 14 Treas. Dec. 463, T.D. 28595, it was held that the purpose of the law was to improve the quality of animals by requiring their ancestors to be of superior pedigree.

Under paragraph 1506 of the Tariff Act of 1922, which was similar to the amended provision of the Tariff Act of 1897, *supra*, it was held that cattle imported by an American citizen who was at most the mere agent of a Canadian citizen, the real owner of the animals, were not entitled to free entry. *C. S. Emery & Co.* v. *United States*, 20 C.C.P.A. (Customs) 340, T.D. 46113. The court stated (pp. 342–343):

Appellant contends that the object of the provision of paragraph 1506 is to improve the breed of domestic animals. That unquestionably is its principal object, but in furthering such object the privilege of free importation *is* limited to citizens of the United States. * * * We are of the opinion that Congress intended to encourage the improvement of the breed of domestic animals but in furthering such purpose intended to give to citizens of the United States an advantage over one who was not such citizen.

It has been held on many occasions that the intent of the importer at and before importation must be to use or sell the animals for breeding purposes. In some circumstances, when such intent did exist at the time of importation, a subsequent use for other purposes, if not wholly inconsistent with the declared intent, may be justified. *United States* v. *196 Mares, supra*; *E. Dillingham (Inc.)* v. *United States*, 57 Treas. Dec. 547, T.D. 43957; *Lawrence Barker* v. *United States*, 4 Cust. Ct. 221, C.D. 326.

In *E. Dillingham (Inc.)* v. *United States, supra*, a cattle dealer imported an animal pursuant to an order from a farmer for a bull for breeding purposes. However, the farmer did not accept him because he was too ugly and the importer sold him to a butcher. It was held that there was a clear intent at the time of importation to import the bull for breeding purposes; that the transaction throughout was marked with good faith; and that it would be unconscionable to require the importer to pay duties under the circum-

stances. See, to the same effect, *E. Dillingham, Inc.* v. *United States*, 3 Cust. Ct. 245, C.D. 245.

In *Lawrence Barker* v. *United States, supra*, it was held that "specially for breeding purposes" did not mean exclusively for that purpose; that animals could be used incidentally for other purposes; and that if it was the purpose of the importer at the time of importation to breed them, it was immaterial that they were afterwards used for some other purpose "unless such use is wholly inconsistent with the intent declared upon entry." It was also pointed out that—

* * * Congress recognized that pure breeds of animals are valuable to the people of the United States for the purpose of improving the quality of our stock and therefore provided for the free entry thereof when imported for breeding purposes.

On the other hand, in *A. Hirschberg et al.* v. *United States*, 41 Cust. Ct. 33, C.D. 2017, it was held that where the importer had an option to purchase a horse under an agreement permitting him to train and prove it at the California racetracks, but where he had no right to use it for breeding purposes and could not have sold it at all, the horse was not entitled to free entry under paragraph 1606(a), *supra*.

From a study of the present statute and its predecessors and the cases cited, we conclude that it was the purpose of Congress to encourage the improvement of the breed of animals in this country by permitting the free importation of purebred registered animals to be used here for breeding purposes, and that purebred animals imported to be sold for exportation to a foreign country, whether to be used there for breeding purposes or not, are not covered by the statute. It is clear that Congress made such strict requirements as to purebreeding and proof thereof because it intended to encourage the improvement of breeds in this country. It was not concerned with such improvement in other countries.

In order to enter merchandise free of duty under paragraph 1606 (a), *supra*, the importer must intend in good faith at the time of importation to use or sell the animals for breeding purposes in accordance therewith. It has been held that it is the intent of the importer at the time of importation that is controlling, rather than the disposition of the animals after entry (*E. Dillingham (Inc.)* v. *United States, supra*; *E. Dillingham, Inc.* v. *United States, supra*; *Carey & Skinner, Inc.* v. *United States*, 36 Cust. Ct. 84, C.D. 1756), but the intent at the time of importation must be clear and the importer must have the right to dispose of the animals for the purpose stated at that time (*A. Hirschberg et al.* v. *United States, supra*).

In the instant case, the only thing that is clear is that the importer intended to sell these animals at a profit. He did not care who bought them and apparently assumed that if more were paid for an animal it

would be used for breeding purposes. At the time of importation, he had a contract for the sale of cattle to the Peruvian Government or a department thereof, and his broker was advised that the imported cattle might be exported. The exportation of these animals was not due to changed circumstances subsequent to importation but was intended at the time of entry, at least as an alternative if no other disposition of the animals was made. On the record presented, the importer has not established that at the time of importation he intended to use or sell these animals specially for breeding purposes in this country.

We hold, for the reasons stated, that these cattle are not entitled to free entry under paragraph 1606(a) of the Tariff Act of 1930, as amended. The protest is overruled and judgment will be rendered for the defendant.