(C. D. 1634)

CAREY & SKINNER, INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided July 15, 1954)

*Tompkins & Tompkins (Allerton deC. Tompkins* of counsel) for the plaintiff. *Warren E. Burger,* Assistant Attorney General (*William J. Vitale,* trial attorney), for the defendant.

Before EKWALL and JOHNSON, Judges

JOHNSON, Judge: This case involves the reliquidations of certain entries under the provision of section 521 of the Tariff Act of 1930 which reads as follows:

## SEC. 521. RELIQUIDATION ON ACCOUNT OF FRAUD.

If the collector finds probable cause to believe there is fraud in the case, he may reliquidate an entry within two years (exclusive of the time during which a protest is pending) after the date of liquidation or last reliquidation.

The entries in question involved the importation of 48 standardbred horses, both male and female, although the testimony refers to them as "colts." Said entries were liquidated free of duty under paragraph 1606 (a), as amended by T. D. 51887, the pertinent portions thereof providing as follows:

### [SCHEDULE 16—FREE LIST]

PAR. 1606. (a) Any animal imported by a citizen of the United States specially for breeding purposes, shall be admitted free, whether intended to be used by the importer himself or for sale for such purposes, except black, silver, or platinum foxes, and any fox which is a mutation, or type developed, therefrom: *Provided,* That no such animal shall be admitted free unless pure bred of a recognized breed and duly registered in a book of record recognized by the Secretary of Agriculture for that breed: *Provided further,* That the certificate of such record and pedigree of such animal shall be produced and submitted to the Department of Agriculture, duly authenticated by the proper custodian of such book of record, together with an affidavit of the owner, agent, or importer that the animal imported is the identical animal described in said certificate of record and pedigree. *The Secretary of Agriculture may prescribe such regulations as may be required for determining the purity of breeding and the identity of such animal:* [Last italics not quoted.] *And provided further,* That the collectors of customs shall require a certificate from the Department of Agriculture stating that such animal is pure bred of a recognized breed and duly registered in a book of record recognized by the Secretary of Agriculture for that breed.

(b) The Secretary of the Treasury may prescribe such additional regulations as may be required for the strict enforcement of this provision.

\*      \*      \*      \*      \*      \*      \*

Upon such reliquidations, duty was assessed upon the horses at the rate of 15 per centum ad valorem under paragraph 714, as amended by the General Agreement on Tariffs and Trade, T. D. 51802, for "Horses unless imported for immediate slaughter: \* \* \* Valued at more than $150 per head."

Counsel for the plaintiff moved for an order to vacate and set aside the reliquidations of November 9, 1951, upon the ground of their being invalid, improper, unwarranted, illegal, null, and void, as there is no basis for belief that there was possible fraud so as to invoke section 521, *supra*. Decision on motion was reserved by the court.

All of the papers in the case were moved in evidence, together with the documents on file necessary to show compliance with the regulations of the Secretary of the Treasury for entry free of duty under paragraph 1606 (a), *supra*.

Counsel for the Government, on the motion, called as a witness Customs Agent Polk to support the collector's contention that he had probable cause to believe that there was a fraud committed against the Government. The witness testified that he was requested to make an investigation relative to the importations. William Carey, Sr., the broker who handled the importations, according to the witness, advised him that he was importing the horses on behalf of George E. Collins. Later, the witness interviewed Mr. Collins, the ultimate consignee, who told him that the horses had been sold at auction; that he, Collins, and James W. Brown were business partners, jointly conducting the Western New York Horse Sales Co. of Batavia, N. Y.; and that each year during the racing season Mr. Collins and Mr. Brown jointly conducted an auction where imported, as well as domestic, horses were sold, including the horses at issue in the pending case.

The witness further testified that Mr. Collins told him that, according to the business arrangement, a 5 per centum selling commission was charged on all horses consigned to the company for sale, with the exception of those horses belonging to Mr. Brown. The witness also stated that he elicited from Mr. Collins that Mr. Brown received all of the money for the horses that were shipped to the United States to Mr. Collins for sale, and that Mr. Collins did not receive any of the proceeds of the auction, relative to the sale of these horses. As to the sale of horses other than those owned by Mr. Brown, the profits were equally divided between Mr. Brown and Mr. Collins, and the records of the company were kept by Mr. Brown. A poster advertising the 1950 sale was admitted in evidence as exhibit A. The poster bore a notice also advising those wishing to sell horses to "contact the undersigned early which will assist us in preparing catalogue." The under-

signed were "Western Horse Sales Co.," "Geo. C. Collins, Waterloo, N. Y.," and "J. W. Brown, New Liskard, Ont."

The witness also testified that he interrogated Mr. Collins concerning his citizenship and was told that he was born in the State of New York; that the horses were purchased at the auction by breeders and nonbreeders; and that Mr. Collins did not make an effort to ascertain whether or not the horses sold were used for breeding purposes, as he had no further interest in them after the sale.

The witness testified further that he also interrogated Mr. Brown concerning these particular horses. Mr. Brown told him that he sent the horses down for sale at auction because the quality of the horses sold there was so poor that it was necessary, in order to attract buyers, to enter some better than average stock in the sale; that Mr. Brown shipped his horses for that purpose; that Mr. Collins became the registered owner of the horses, in order to fulfill the requirements for free entry into the United States, as it was necessary that the importer be an American citizen, and Mr. Collins served that purpose. As to ownership of the horses, the witness testified:

Q. Did Mr. Brown admit to you that he actually owned the horses?—A. No, sir.

Q. I say did Mr. Brown——A. Not in so many words, no, sir.

Q. Well did Mr. Brown tell you that or did you ask Mr. Brown whether or not he actually sold the horses to Mr. Collins—A. Yes sir. He stated that he did not and I asked Mr. Collins the same question and he stated that he did not purchase the horses from Mr. Brown.

Q. That he merely acted as agent for Mr. Brown in selling the horses?—A. He didn't use the word "agent"——

Q. I am saying that——A. Yes, sir; that he sold them at the auction, Mr. Brown sold them at the auction jointly.

The witness also stated that Mr. Brown had shown him a list, the last five horses of which were purchased by Canadians and returned to Canada.

Upon cross-examination, the witness admitted that the importer of record was Carey & Skinner, Inc., for the account of George E. Collins, and that the declarations of the nominal consignee or agent contained the name of George E. Collins. He also admitted that Mr. Collins told him that he, Collins, had the auctioneer announce that "it was a sale of breeding animals or breeding horses." The witness also stated it was his recollection that Mr. Brown told him that he did not sell the horses to Mr. Collins and that Mr. Collins told him that he did not buy the horses from Mr. Brown. The witness recalled the circumstances of Mr. Collins' statement as follows:

A. * * * I asked Mr. Collins if there had been monies paid to Mr. Brown for the horses. * * *

   *        *        *        *        *        *        *

A. * * * On the original 20 horses Mr. Collins stated that he had advanced Mr. Brown $5,000 which was to be repaid after the horses were sold or be deducted from the monies returned to Mr. Brown. And that in connection with the 28 horses there had been no financial transaction prior to the sale at the auction.

XQ. Do you recall whether Mr. Collins told you that he bought the horses at a guaranteed minimum price?—A. There was no reference to my knowledge of guaranteed minimum.

James W. Brown, the seller of the horses, testified for the plaintiff that he operated a farm and handled livestock and was one of the largest breeders of pedigreed standardbred horses in Canada; that he was president of the Canadian Standardbred Horse Society for 3 years; that the society handled the registrations of standardbred horses and is a branch of the Canadian Department of Agriculture. The witness testified also that he owned the last living son of Grattan Royal, one of the outstanding sires of standardbred horses on the continent; that Mr. Collins was conducting sales in the United States as he, Mr. Brown, was in Canada, and Mr. Collins suggested to him that it would stimulate his sales and attract more buyers if he had some breeding stock of the class of the horses that Mr. Brown sold at his auction. Consequently, an agreement was entered into whereby Mr. Collins would guarantee Mr. Brown $250 per colt, and anything that was sold over and above that figure, Mr. Brown was also to receive. Mr. Brown was to assist in managing the sale and pay for the advertising in Canada, not only of his colts, but of the sale in general—

* * * And he [Collins] was to pay me so much for the horses as a guarantee when he purchased them and I was to receive whatever the colts sold for afterward in addition to the guarantee. Then we were to divide any horses that were consigned to the sale, we got $5 for cataloging and we got 5 percent for selling them. That was consigned horses. Outside of horses that Mr. Collins might own himself or any horses that I might buy in the United States these colts were to be bought from me. There was to be no commission charged on any of the horses that were either owned by Mr. Collins in the United States or the colts that he bought from me. And we only divided the 5 percent of the consigned horses to the sale plus $5 for cataloging. And we have carried on this sale for, I think it is five or six years since we started.

The witness further testified that the partnership, the Western New York Horse Sales Co., sold horses on a commission basis from third parties, and the two partners shared in the profit. No commission was charged by the company on the sale of either Brown's or Collins' horses. The witness stated he was guaranteed a minimum price of $250 for each horse, that was, an average price, and, if the horses were sold on an average price for more than that, he received the money. The only way Collins shared in the benefits was in the advertising Brown did for the sale and in stimulating interest in the auction. Concerning the sale of the horses to Mr. Collins, the witness testified:

Q. Did you intend to sell these 48 horses to Mr. Collins?—A. Well, I did under those arrangements.

Q. You intended to sell?

\* \* \* \* \* \* \*

A. I did under those arrangements; yes; received his check for them.

The witness indicated that he heard Mr. Polk testify that he, Brown, told him that he did not sell the horses to Mr. Collins. Mr. Brown was of the opinion that Mr. Polk must have misunderstood him, because the arrangement was as he had previously testified. He testified further that he intended title to pass to Mr. Collins prior to the exportation of the horses, and they were actually all transferred with the Department of Agriculture to Mr. Collins' name before they were exported, and that Collins had the registration papers in his name.

The witness further testified that Mr. Collins had the unconditional right to sell the 48 horses in the United States; that they were in his name, and he could do as he liked with them; that, so far as he was concerned, the horses were owned by Mr. Collins, and the only condition attached thereto was that if, when sold, any brought more than $250 on the average, he, Mr. Brown, was to receive anything over that amount; and that he was paying the advertising in Canada, which would amount to from $500 to $600 a year.

Referring further to the price paid for the horses, Mr. Brown stated that the Western New York Horse Sales Co. did not enter into the transaction at all as either buyer or seller and that the deal was just between Mr. Collins and himself. Counsel for the plaintiff referred the witness to the entry papers. Therefrom, the witness testified that Carey & Skinner, Inc., was the broker, and where his own name appeared as having "sold the goods," he could not see anything wrong with that statement, because Mr. Collins was the purchaser and he was the seller.

An affidavit from the registrar of the Department of Agriculture, where the horses in question were registered, certified to the official records. It was offered and admitted in evidence as plaintiff's exhibit 1. Such affidavit disclosed that the horses were purebred and were transferred from Mr. Brown to Mr. Collins.

On cross-examination, the witness further testified that any horses that Mr. Collins consigned to the sale, whether they were his horses, that is, the horses he sold to Mr. Collins or horses belonging originally to Mr. Collins, there was no commission charged; and that Mr. Collins purchased his horses for the purpose of consigning them to the sale. To elucidate further on that, witness testified:

X Q. I'm just asking you on the horses that you sent him from Canada was he to charge a commission or was the firm, the company to receive a commission on those horses?—A. No. They were Mr. Collins' horses.

\* \* \* \* \* \* \*

X Q. You were to get at least $250?—A. That's right.

X Q. What would happen if they sold for less than $250 average?—A. Well, Mr. Collins would be responsible. He guaranteed me that price. Some horses didn't bring that but the average did.

\* \* \* \* \* \* \*

X Q. If the horses were sold at an average of $100 each would Mr. Collins have to pay you $150 average each on the horses to make up the difference?—A. Technically, under the agreement, yes; he'd have to pay me.

The court asked the witness if he considered that he had made a *bona fide* sale of the horses to Mr. Collins, and he replied that he did, and when the judge asked him if he intended to confer title to Mr. Collins at the time, the witness answered: "I did give him title."

George E. Collins testified that he was born in East Windsor, N. Y.; that he guaranteed Mr. Brown $250 each for the horses, and "I bought them right out and paid him for them, paid him in cash"; that he owned them at the time of importation and had title to them; that he sold the 48 horses for breeding purposes, announcing personally before the sale that they were being sold for breeding purposes. The witness stated that he sold about 50 other horses, which had been consigned for sale, but such consignments did not have anything to do with the colts, and the 48 horses were consigned by him to the Western New York Horse Sales Co. to be sold. The witness testified further concerning his purchase of the horses as follows:

Q. Do you recall ever having told Mr. Polk or any other Government attorney that you did not buy these 48 horses?—A. I never told no one no such thing. That's the gentleman sitting right there asked me why I paid for them and I told him the man needed the money. That man sitting right there.

\* \* \* \* \* \* \*

Q. Did you tell him that you did not buy——A. I did not tell him no such thing. \* \* \*

\* \* \* \* \* \* \*

JUDGE FORD: Mr. Brown would not ship his horses over until you guarantee him $250 apiece?

THE WITNESS: That's right. I bought them right out. I didn't guarantee, I bought them right straight out and paid for them with my own check on my own bank at home.

\* \* \* \* \* \* \*

X Q. \* \* \* You heard Mr. Brown testify that on these 48 horses that he sold to you he received all the proceeds of the sale?—A. Yes, sir. I never had a penny.

X Q. So therefore the title was passed to you so that you could sell them for him?—A. No, sir. I bought them right out to stimulate the sale, to make an auction.

When it was called to the attention of the witness that the horses were paid for after the auction, he stated that he paid for them out of his own account; that the horses at the sale were not all paid for at the auction and some not until 3 weeks later; that, in 1949, there were 65 horses sold, including 28 of Mr. Brown's colts. The witness also stated that he, personally, had enough money in the bank to pay the

checks he issued for the colts at the time he paid Mr. Brown. As to the proceeds of the auction, the witness testified that any money transaction was with the clerk, Bill Brown; that, after the colts were sold, the witness took back the money he had paid Mr. Brown for the colts, and Mr. Brown also got the difference between the $250 and what his colts brought, but the witness pointed out that Mr. Brown did all the advertising and had been doing all the work also, for the witness had been ill for 2 years.

The witness further testified that at the time he imported the colts it was his intention to import them for the purpose of breeding, and, in making any statements upon the shipping papers, he never knew that he had made any statements which were not true.

Arnold Emerson testified that he is an auctioneer and had been auctioning horses for 28 years; that he sells horses for all that he can get for them; that he made no announcement that the price would have to be at any guaranteed figure; that the prospective buyers started at any price they wanted; and that, when sold, the buyer signed an order sheet for the amount that he had to pay for the horse and took it to the cashier. The witness also stated that the auctions in question were the only ones where he conducts sales of standardbred horses. Before the auctions started, the witness said that Mr. Collins stated to the prospective buyers that the horses were to be sold for breeding purposes, and the witness also announced each day, before he started to sell, that the horses were to be sold for breeding purposes and the terms of the sale. The witness testified that he sold the horses in question on behalf of the Western New York Horse Sales Co.; that such horses had been consigned to that company by Mr. Collins for sale for breeding purposes; and that fact also appeared in the auction catalogs, that is, that the horses were consigned for sale to that company by George E. Collins.

Mark Kyler testified he has been a breeder of horses to race and to sell for 20 years; that he attended the 1949 auction in question and, before the sale started, heard Mr. Collins or the auctioneer, or both of them, announce that the horses were being sold for breeding purposes. The witness stated that he bought Glendale Charlie, raced him, and that he is the sire of three colts. The witness further testified that he looked over all of the purebred horses which were for sale and at their records and expressed the opinion that they should make good breeding stock.

Frank G. Kewley, also a breeder of horses, testified that he had purchased Glendale Dainty in 1950 from the auction; that he heard Mr. Collins make the announcement that the horses were being sold for breeding purposes; and that he has bred the horse he bought. The witness also testified that he signed a statement that the horses

were announced as being for sale for breeding purposes. Such statement was admitted in evidence as exhibit 5.

Counsel for the plaintiff contends that the 48 horses are entitled to free entry; that it is not essential that the importer of the horses be the unconditional legal owner thereof at the time of importation, in order to be granted free entry; that, therefore, the collector was not justified in assuming that he had probable cause to believe there was fraud connected with the importation; and such reliquidations made for that reason are illegal and void.

Counsel for the Government contends that the collector was justified in suspecting fraud and reliquidated the entries for the reason that the importer was, in fact, acting as agent for and on behalf of a Canadian citizen, operating under color of title to the horses; that the United States citizen importer merely acted as "a dummy for the Canadian shipper," thus depriving the United States Government of its just duties. Counsel observed that in order to enter pedigreed animals free of duty under the provisions of paragraph 1606 (a), *supra*, the citizen must be the actual and legitimate importer of the animals and not merely the agent of a foreign citizen.

Government counsel attempts to distinguish the case of *E. Dillingham, Inc.* v. *United States*, 27 Cust. Ct. 109, C. D. 1356, by stating "He [the citizen] need not be the unconditional owner of the animals only where they have been legitimately acquired upon consignment for use or for sale," as held in that case.

The regulations of the Department of Agriculture, Bureau of Animal Industry, promulgated under authority of paragraph 1606 (a), *supra*, for determination of the purity of breeding and identity of pedigreed animals, Code of Federal Regulations, 1949 edition, title 9, chapter 1, page 230, in force at the time of importation of the horses in question, provide as follows:

### CERTIFICATE OF PUREBRED ANIMALS

§151.1  *Issuance of certificates of pure breeding.* The Bureau of Animal Industry of the Department of Agriculture shall issue certificates of pure breeding under the provisions of this part and forward them to the collector of customs at the port of entry.

§151.2  *Requirements for issuance of certificates of pure breeding—*(a)  *Application for certificates.* An application for certificates shall be made to the Bureau of Animal Industry on forms furnished or approved by the Department, showing the number of animals imported, the breed and sex, the port of arrival into the United States, customs entry number, the name of the vessel or carrier by which shipped, and the date of arrival. This application may be signed by either the owner, agent, or importer, stating the name and address (in the United States) of the owner of the animal or animals.

(b)  *Certificate of pedigree.* Certificates of pedigree for such animals, issued by the custodian of a book of record given in §151.6, or which are acceptable to an American registry association having reciprocity with the foreign association in

the registration of animals, shall be furnished to the Bureau of Animal Industry. They will later be returned to the sender.

(c) *Transfer of ownership.* Complete transfer of ownership from the breeder to the importer shall be furnished, such transfer to be recorded on the pedigree certificates, or on official certificates of transfer of the registry association.

(d) *Affidavit of identity.* An affidavit, duly acknowledged before an officer having authority to administer oaths and bearing his official seal, from the owner, agent, or importer, that the animals so imported are the identical animals described in the certificates of pedigree, shall be furnished to the Bureau of Animal Industry.

\*       \*       \*       \*       \*       \*       \*

The first question presented is whether or not the collector was justified in reliquidating the entries covering the horses at issue under the provisions of section 521, *supra,* upon the basis of his "factual inquiries." From the circumstances of the case, if the collector was not so justified, irrespective of the report to him of the customs agent making the investigation, his reliquidations are illegal and void under the provisions of section 514, Tariff Act of 1930.

From the evidence presented, Mr. Collins was the importer of record. He is an American citizen. The horses were imported especially for sale for breeding purposes. They are all standardbred of a recognized breed and duly registered in a book of record, recognized by the Secretary of Agriculture for that breed. The certificates of record were produced, duly authenticated by the proper custodian of such book of record. The importer's affidavit that the animals imported were the identical animals described in the certificates of pedigree was duly filed. The transfer of ownership required by the regulations of the Bureau of Animal Industry is the recording thereof on the pedigree certificates or the official certificates of transfer, which were duly filed in accordance with law and the regulations.

The testimony of the customs agent leaves the impression that he intended his report to show that Mr. Collins was not the importer of the horses in question; that he was not the owner of the horses; and that he conspired with Mr. Brown, the Canadian producer and real owner, to act as his accomplice, so as to enable the Canadian producer to import standardbred colts into the United States, without the payment of the duty rightfully due thereon.

The testimony of Mr. Collins and Mr. Brown is quite contrary to the testimony of Mr. Polk, the customs agent, as to what these two witnesses answered to the questions he asked them. They both were of the opinion that the customs agent misunderstood them. Just how he was able to induce these gentlemen to tell him that the one did not sell and the other did not buy the horses is unexplainable, unless such admissions were the result of a misunderstanding, or that the customs agent's interpretation of the information he gained from his interrogation was erroneous.

Upon cross-examination, the customs agent recalled the statements of Mr. Collins which lead him to testify that Mr. Brown told him he did not sell, and Mr. Collins told him he did not buy. In the opinion of the court, Mr. Collins' statement, quoted above, would lead to no such conclusion. He either was to obtain the $5,000 he had paid Mr. Brown after the sale, by reason of selling the horses, or Mr. Brown, who handled all of the bookkeeping transactions for the Western New York Horse Sales Co., was to reimburse Mr. Collins. In other words, it was agreed that the only advantage or profit Mr. Collins was to receive from selling those horses was the money Mr. Brown spent to advertise the horse auction. Mr. Collins stated, in the course of his testimony, that he was selling Mr. Brown's colts at the auction and also referred to the imported horses as Mr. Brown's colts. In so stating, it is clear that he had reference to the horses bred by Mr. Brown, as distinguished from those of other sellers of horses consigned to the auction. That statement could not be accepted as establishing that Mr. Collins had no title to the horses.

The documentary evidence, as well as the oral evidence, fully establishes that Mr. Collins had sufficient title to the horses to consign them to the sale and also sufficient to transfer unconditional title to the purchasers. It is established that Mr. Collins was the owner of record of the horses at the time of importation and that it was his purpose to import the horses for purposes of sale for breeding. It is entirely immaterial whether or not his ownership was a complete ownership, a conditional ownership, or an ownership based on consignment. Mr. Collins, it is clear, did not import the horses for the exclusive use of any person not a citizen of the United States. He paid for the animals with his own money, and, for all that appears, he had the exclusive control of the disposition thereof. An importer who is an American citizen, having the lawful possession of imported animals imported for breeding purposes, as evidenced by a complete record of transfers of ownership from the breeder to himself, which shall have been recorded on the pedigree certificates, approved by the registry association, may rightfully claim exemptions from duty under the provisions of paragraph 1606 (a) when imported for the purposes there set out.

The case of *E. Dillingham, Inc., supra*, involved purebred cattle imported by a firm in the business of buying and selling cattle. Title was acquired to the cattle upon consignment for sale for breeding purposes. In that case, the court particularly pointed out that the affidavit of the owner, agent, or importer accompanying the certificate of registry to the Department of Agriculture was not for the purpose of identifying the owner, but for the sole purpose of identifying the animal. Also, that the permission granted the Secretary of Agricul-

ture to prescribe regulations referred to such as would determine the purity of breeding and identity of the animal, not the owner.

In the *Dillingham* case, *supra*, the evidence established that the association registering the purebred animals does not attempt to determine who holds the legal title to a registered animal and makes no distinction between an unconditional sale and a consignment for sale, and, therefore, the registration papers do not distinguish between the legal owner and an owner who only has rightful possession. The same form of application for transfer of ownership is used in all cases where the physical possession of the animal is transferred from one man to another, irrespective of whether legal title passes or not. The date on the pedigree certificate shows a transfer of ownership which does not necessarily mean an unconditional sale and would include consigned cattle.

In an early case, *Amicus Van Steenberge* v. *United States*, 14 Treas. Dec. 463, T. D. 28595, G. A. 6689, in holding horses properly entitled to free entry for breeding purposes, the court stated:

It is a well-settled principle that a verbal contract for the sale of personal property is valid, and that the sale is completed when the seller, by actual delivery or other unequivocal act, intentionally passes the title of the property to the purchaser, whether the price is fixed by agreement or is left to be adjusted by future stipulation of the parties to the contract. In our opinion, the evidence shows a sale of the animals in question fully completed by delivery to the purchasers.

We are unable to see any distinction between the *Dillingham* case, *supra*, where cattle were imported by a citizen of the United States, consigned for sale, and the case here presented, where the citizen-importer brought in standardbred colts, which he had purchased at a guaranteed price for consignment to the Western New York Horse Sales Co., which, in turn, consigned the same to be sold at auction. If anything, the importer here has made out a much better case. There was no idea apparent that these gentlemen were endeavoring to perpetrate a fraud upon the Government. The colts were imported within the intent as well as the letter of the law.

For the reasons stated, and following the cases cited, we hold that the reliquidations of November 9, 1951, are invalid, inasmuch as the collector was not warranted in invoking section 521, *supra*, and the liquidations of the entries had long since become final and conclusive upon all parties, under the provisions of section 515, *supra*.

Motion of counsel for plaintiff to set aside the reliquidations of November 9, 1951, is, therefore, granted. Judgment will, therefore, be entered in favor of the plaintiff, directing the collector to refund all duties collected under said invalid reliquidations.