(C. D. 2157)

BORDER BROKERAGE COMPANY
DAHL FISH COMPANY ET AL. } *v.* UNITED STATES

United States Customs Court, Third Division

(Decided March 17, 1960)

*Lawrence & Tuttle (Barnes, Richardson & Colburn* by *Hadley S. King* and *Edward N. Glad* of counsel) for the plaintiffs.

*George Cochran Doub,* Assistant Attorney General (*Henry J. O'Neill, Murray Sklaroff,* and *Margaret M. Vallerie,* trial attorneys), for the defendant.

Before JOHNSON, DONLON, and RICHARDSON, Judges; DONLON, J., concurring

JOHNSON, Judge: These protests, consolidated at the trial, cover a large number of entries of fresh fish imported from Canada between July 1, 1953, and July 19, 1955, and entered at the port of Blaine, Wash., in the name of customs brokers, but for the account of Dahl Fish Company, Bellingham, Wash. The entries were liquidated on the basis of the entered weights; no protests were filed, but, with a few exceptions, hereinafter noted, the entries were reliquidated by the collector within 2 years after the date of the original liquidation, under section 521 of the Tariff Act of 1930, which provides:

If the collector finds probable cause to believe there is fraud in the case, he may reliquidate an entry within two years (exclusive of the time during which a protest is pending) after the date of liquidation or last reliquidation.

At the trial, counsel for the importer stated:

* * * we concede that the reliquidations were made within two years of the date of the original liquidation in each instance.

However, it appears from the official papers that the following entries, covered by protest No. 305870–K, were reliquidated more than 2 years after the date of the original liquidation:

| Entry No. | Liquidated | Reliquidated |
|---|---|---|
| 449214 | 4/ 5/54 | 6/20/56 |
| 449454 | 4/12/54 | 6/20/56 |
| 449494 | 4/12/54 | 6/20/56 |
| 759207 | 4/16/54 | 6/20/56 |
| 759211 | 4/16/54 | 6/20/56 |
| 759224 | 4/16/54 | 6/20/56 |
| 759559 | 4/16/54 | 6/20/56 |
| 759918 | 4/16/54 | 6/20/56 |

As to these entries, the reliquidations are illegal and void because more than 2 years have elapsed since the dates of the original liquidations. The collector will be directed to refund the increased duties taken under the invalid reliquidations.

It further appears from the record that the following entries were liquidated by the collector on the basis of a quantity greater than the entered quantity, but were never reliquidated:

| Protest No. | Entry No. |
|---|---|
| 305855–K | 759567 |
| " | 760158 |
| " | 760833 |
| 305854–K | 5407 |
| 305860–K | 4584 |
| " | 5416 |
| " | 5713 |
| " | 6463 |
| " | 6769 |
| " | 6926 |
| " | 6994 |
| " | 7026 |
| " | 7052 |
| " | 7085 |
| " | 7109 |
| " | 355 |
| " | 363 |
| " | 364 |

As to these entries, no question of probable fraud arises. The only issue is whether the entries were liquidated correctly by the collector.

The following entries in protest No. 305860–K bear a stamped nota-

tion "Liquidated," but the date thereof has been crossed out, and a sheet attached to the entry bears the notation, "liquidated June 20, 1956":

4814
4832
4856
4885
4977
5019
5350
5369

Although it would appear that the liquidations were not completed on the date crossed out, in view of counsel's statement that reliquidations were made within 2 years of the original liquidation, we consider these entries as having been liquidated on the first date stamped and as having been reliquidated within 2 years thereafter.

The first issue to be considered in this case is the validity of the collector's reliquidations. Liquidations ordinarily become final and conclusive upon all parties 60 days after the date thereof, unless a protest has been filed, but, under section 521, *supra*, the collector is permitted to reliquidate within 2 years after liquidation provided he finds probable cause to believe there was fraud in the case. It is well settled that the burden does not rest upon the importer to prove that there has been no fraud, but that it devolves upon the Government to establish that the collector had probable cause to believe that there was fraud in the case. *F. Vitelli & Son* v. *United States*, 250 U.S. 355; *United States* v. *Waterbury Lock & Specialty Co.*, 35 C.C.P.A. (Customs) 131, C.A.D. 384; *Pacific Brokerage Co.* v. *United States*, 3 Cust. Ct. 20, C. D. 193; *New England Fish Co.* v. *United States*, 4 Cust. Ct. 230, C.D. 329; *Geo. Wm. Rueff, Inc.* v. *United States*, 20 Cust. Ct. 72, C.D. 1087. Where the collector is not warranted in invoking section 521, *supra*, his reliquidation more than 60 days after liquidation, no protest being pending, is invalid. *E. Dillingham, Inc.* v. *United States*, 27 Cust. Ct. 109, C.D. 1356; *Carey & Skinner, Inc.* v. *United States*, 33 Cust. Ct. 48, C.D. 1634; *Carey & Skinner, Inc.* v. *United States*, 36 Cust. Ct. 84, C.D. 1756; *John S. Connor* v. *United States*, 37 Cust. Ct. 74, C.D. 1800.

In support of its contention that the collector had probable cause to believe there was fraud in the instant case, the Government called Clarence M. Dolgner, under whose personal supervision as liquidator and acting deputy collector the entries herein were reliquidated. He testified that, on or about March 26, 1956, he received the original report of Customs Agent R. J. O'Hearn, together with attached documents and exhibits, and a large envelope containing photostatic copies of State of Washington Fish Receiving Tickets, and invoices and ledger sheets of B.C. Fishermen's Independent Co-operative Asso-

ciation, Vancouver, B.C. (hereinafter called B.C. Co-operative). Said documents, together with a letter dated February 23, 1956, from Border Brokerage Co. and enclosures, came to his attention prior to his reliquidation of the entries herein and were relied upon and taken into consideration in making the finding that there was probable cause to believe there was fraud. Said documents were received in evidence as defendant's collective exhibits A, B, and C, respectively, to show what was before the collector at the time he made his finding.

It appears from testimony taken at the trial that, in the spring of 1955, Customs Agent O'Hearn extracted invoices covering entries by the Dahl Fish Company from customs files at Blaine, Wash., and that he examined the records of the Dahl Fish Company at its office in Bellingham. Since considerable discrepancy was noted between the records maintained by the importer for use in reporting taxes to the State of Washington and the invoices accompanying the Blaine entries, an investigation was commenced about May 17, 1955, and was carried on thereafter by Mr. O'Hearn and Supervising Customs Agent Phil G. Fraser both in this country and in Canada.

According to the testimony of Mr. Kjell Dahl, the fish involved herein was purchased from B. C. Co-operative pursuant to arrangements made with Mr. Herbert Taylor, manager and bookkeeper. The record indicates that the following procedure was generally observed in connection with these importations: When the fishing boats tied up at the pier, the fish was unloaded by buckets and deposited in trucks of the Dahl Fish Company. The number of buckets was entered on a tally sheet, and a Canadian Customs Export Form (B-13) and an invoice, both showing the estimated quantity of fish, were made out. The truckdriver filed the export form with the Canadian customs office at the border, and, after report of arrival at the United States Customs, took the invoice to the customs broker, who prepared the entry and obtained clearance of the cargo. Since there were no weighing facilities at Blaine, the merchandise was not weighed there by customs officials. The trucks were driven to the Dahl Fish Company at Bellingham where the fish was unloaded and weighed. State of Washington Fish Receiving Tickets giving the weight and value of the fish were made out in triplicate in connection with the payment of a tax imposed by the State of Washington. One copy was sent to the State, one was sent to B. C. Co-operative together with a check in settlement of the account, and one was kept by the Dahl Fish Company.

During the period involved herein, entry was made on the invoiced weights. As a result of his investigation, Customs Agent O'Hearn found that there was an agreement between Dahl Fish Company and B. C. Co-operative whereby the former had the right to take discounts or weight reductions on each shipment to effect a net saving of 5 to 25 percent; that an independent agreement was concluded between Mr.

Kjell Dahl and Mr. Herb Taylor of B. C. Co-operative whereby Mr. Taylor, at the request of Mr. Dahl, agreed to furnish invoices and prepare Canadian customs documents in which the weights shown were 20 percent less than the actual amounts placed on the trucks; and that Mr. Dahl represented to Mr. Taylor that the invoices would be used in clearing the trucks at the border and that entry would be made at the true weights found by the importer over his own scales in Bellingham.

The customs agent also reported:

Examination of the Cooperative records, such as fish boat tally books, notations on invoices, the ledger account, and correspondence, showed repeated discrepancies between the quantities of fish shipped and the quantities declared. Payments recorded on the ledger did not harmonize with the prices shown in invoices. The copies of the State of Washington Fish Receiving Tickets, which the importer had returned to the Co-operative in evidence of the quantities of fish received, and in support of payments remitted, although clearly indicating receipt of a quantity of fish in excess of that which had been declared, were confused, misleading and false.

*     *     *     *     *     *     *

As a result no picture of actual quantities or specie of fish shipped was obtainable from the Co-operative's records, other than a clear indication that settlement was consistently on the basis of more fish than had been declared.

In one instance, described in defendant's collective exhibit A, the merchandise covered by entry No. 1236 (protest No. 305858–K) was weighed in Bellingham by Deputy Collector Hogan and found to consist of 6,640 pounds of cod and 1,175 pounds of sole. A slip attached to the invoice gives the figures 5,465 pounds of cod and 1,175 pounds of sole, but entry was made for 5,400 pounds of cod and 1,000 pounds of sole. In a conversation with Mr. O'Hearn, Mr. Taylor stated that he had shipped 6,640 pounds of cod and 1,175 pounds of sole; that the quantity shipped exceeded the invoiced quantity by more than 20 percent. Mr. Taylor also stated, as to entry No. 2799 (protest No. 305870–K), which shows 600 pounds of sole, 2,000 pounds of flounder, and 800 pounds of cod, that he discharged into the Dahl truck 650 pounds of sole, 2,200 pounds of flounder, 805 pounds of gray cod, and 400 pounds of rock cod. He made similar statements as to other entries.

A letter from Mr. Taylor to the Supervising Customs Agent at Seattle, included in defendant's collective exhibit A, contains a statement prepared by the former showing the invoiced weights and those on the corresponding B.C. Co-operative records. For the most part, the latter show substantially greater quantities.

In a sworn statement made before Customs Agent O'Hearn, Mr. Kjell Dahl admitted that the truckloads of fish were entered on estimated weights which were not the true actual weights of the fish. He also admitted that "the trucks were coming over too heavy for

what they were declaring at the border" and that "it became apparent that the manifested weight was sometimes as high as 2,000 to 3,000 pounds under the actual weight of the merchandise imported." Mr. Dahl stated that he had knowledge that the entered weights were incorrect, but claimed that he was without any means of correcting them. He said that, through his broker, customs officials were notified that the importer wished to change its entries because the amounts were not right. "We didn't discuss any amounts with them," he said. "We told them there is a difference on fish coming across, ice and slime, but we didn't tell them it was greater than the reasonable percentage of ice and slime and tried to have the situation changed where we could weigh the trucks here and send them back the receipt, which we did temporarily."

Several of the customs officials stated that they had weighed fish at the Dahl Fish Company and had found that the scales were out of balance and had to be corrected each time. One witness mentioned that the scales were tampered with even while the weighing was going on.

Edward J. Safarich, with whom Dahl Fish Company also did business, stated that he underestimated the amount of fish exported, at the request of Mr. Karl Dahl, and that he had underestimated in the amount of 12,154 pounds.

Defendant's collective exhibit C includes a letter, dated February 23, 1956, from Border Brokerage Company to the collector at Seattle transmitting an audit of the importation of Dahl Fish Company made by Stanley F. Hull, C.P.A., showing 128,403 pounds of fish underdeclared and $1,021.92 in duty still due. A check in payment of same was also transmitted to the collector. The broker's letter states:

No letter of explanation was given to us regarding the discrepancy. We have not verified the figures nor did we aid in their preparation, other than giving the accountant our files. Prior to the investigation by the supervising customs agent, we were not aware that there was any discrepancy between the imported amounts and entered amounts.

An independent comparison of the entered weights with the amounts given on the fish tickets contained in defendant's collective exhibit B reveals that these weights do not check and that the weights on the fish tickets are usually higher.

At the first hearing, there were received in evidence from the file of the Supervisor of Statistics, State of Washington, without objection, copies of the fish receiving tickets filed with the State of Washington Department of Fisheries by the Dahl Fish Company (defendant's collective exhibit D). At the close of the trial, some months later, a motion was made by counsel for the plaintiff to strike said exhibit. While this motion was not specifically passed upon by the

trial judge, both parties listed the exhibit in their briefs and the motion to strike was not referred to. The motion is denied.

A comparison of the tickets in defendant's collective exhibit D with the copies forwarded by Dahl Fish Company to B.C. Co-operative (defendant's collective exhibit B) shows that in many cases higher quantities appeared on the latter.

Mr. Kjell Dahl testified that payments were made for the fish on the basis of actual weights found on the Dahl Fish Company scale, but that entry was made on estimated weights, except for a period during which he telephoned the broker when there was a difference in weights. Estimates were arrived at by counting the number of buckets that went into the truck; it was definitely a guess within 10 or 15 percent. He did get some actual weights on salmon from other companies that had scales.

Mr. Dahl denied that he had told Mr. Taylor to underestimate the weight of the fish, but said he told him to be careful in his estimates.

He said the State of Washington Fish Receiving Tickets were made out in triplicate and one copy was filed with the State and one was sent to Mr. Taylor. Many times the copy which he forwarded to Mr. Taylor showed a considerably higher weight than the copy that went to the State. The witness stated:

* * * If we run into any poor fish we would make deductions on that, and it would be on Taylor's tickets alone. Or if we ran across any the foreman comes to me and says, "Look, we got good recovery off that fish. I must have missed a bucket," or something like that, when we unloaded, or we did not weigh the fish, we estimated the weight of the fish and dumped it into our building back there because our scale was busy with other items, and then checked them on recovery weights. And naturally we put into the State of Washington the weight that was claimed by the ticket normally.

The witness added that he paid duty on the estimated weights; that they were not the same as the actual weights; that he thought it averaged itself out. He said he told customs officials about the discrepancy but that he could not reenter. The witness stated that he had called the attention of his broker to the discrepancy in weights, but he did not remember what the broker told him.

Mr. Grasher, the broker, testified that about 10 times during the period the Dahl Fish Company called to give him the correct weights and that slips of paper showing them were attached to the entries. Only two entries, Nos. 1235 and 1236 covered by protest No. 305858–K, have such attachments.

Mr. Herbert Taylor, who was manager of B.C. Co-operative from 1953 to January 1956, testified that he reported an estimated weight of fish to Mr. Dahl and that he was paid on the basis of the weight found by Mr. Dahl. He testified:

Q. Did Mr. Dahl tell you anything about estimating the weight?—A. Yes. At one time Mr. Dahl asked me to estimate it low so that when he was paying

the duty which he had 48 hours to do he wouldn't have to wait to get his money back if I estimated it over. So he asked us to estimate low.

Q. Did you estimate low?—A. I did.

\* \* \* \* \* \* \*

Q. Was your first transaction with Dahl based on a low estimate; were you asked to make a low estimate at that time?—A. No, sir.

Q. The first one was all right, you estimated the weight you thought it should be estimated. And would you say that the bulk of your transactions with Mr. Dahl were based on a low estimate?—A. I would.

Q. And this was on the request of Mr. Dahl?—A. Yes, sir.

Mr. Taylor admitted that he deliberately misrepresented the weight, because he was asked to do so, but said he did not know the duty was based on the estimated weights, because Mr. Dahl gave him the impression that the importer had 48 hours to correct the weight. After a certain date, he was told by Mr. Dahl to make his estimates as accurately as possible. They decided to weigh the trucks and guess at the amount of ice and slime on the fish to get an accurate weight. Only a few of the entries have tickets attached showing the weight of the truck and the weight of the load.

Mr. Taylor identified the documents contained in defendant's collective exhibit B as photostatic copies of fish tickets which he received from the Dahl Fish Company, indicating the actual weight of the fish shipped.

It is clear from the evidence presented in court that the importer made entry on the basis of estimated weights which it knew were not correct. Mr. Dahl's statement that he told customs officials there was a discrepancy between the entered weight and the actual weight, but that he could not find a way to make correct entries, is incredible. These importations continued over a long period of time. The importer employed a customs broker. Some method could have been devised by which correct entries could have been made. According to the witness, actual weights were obtained for salmon prior to its being put on the trucks, apparently because this was a higher priced fish. It is significant that although the witness testified that he had told the broker about the discrepancy in weights, he could not remember what the broker told him. According to the broker's letter (defendant's collective exhibit C), the broker had no knowledge of any discrepancies until receiving Mr. Hull's report. Mr. Dahl admitted that the weights shown on the copy of the fish tickets filed with the State of Washington were not the same as those on the tickets sent to Mr. Taylor, and that the latter many times showed a considerably higher weight. Although Mr. Dahl denied having instructed Mr. Taylor to make low estimates, Mr. Taylor testified that he had done so at Mr. Dahl's request.

A careful analysis of the voluminous documents which were before the collector prior to reliquidation leads to the conclusion that the

collector had ample grounds upon which to base his finding that there was probable cause to believe that there was fraud in the case.

The importer contends, however, that, in order to prevail, the Government must establish that actual fraud existed, relying upon *Border Brokerage Co. et al.* v. *United States*, 41 Cust. Ct. 49, C.D. 2020. There, the court stated:

> While counsel for the parties in these cases have both seemingly proceeded upon the basis that the extent of the Government's burden in these cases is to establish that the collector had probable cause to believe there was fraud in the case, nevertheless, we are satisfied from research and consideration of the statute involved that, while it is a condition precedent to reliquidation of an entry under section 521 that the collector find probable cause to believe there is fraud in the case, the burden of the Government *upon the trial of a protest against the reliquidation* is to establish that there was actual fraud in the case. [Italics quoted.]

However, the actual holding of the case was that since the defendant had not produced the documents that were before the collector when he reliquidated, the court could not come to any conclusion as to whether or not the collector had probable cause to believe there was fraud.

In an earlier case, *Geo. Wm. Rueff, Inc.* v. *United States, supra,* the court stated (p. 76):

> We have analyzed the letter (exhibit A) carefully, that being the only evidence upon which the assistant collector found reason to believe probable cause of fraud existed in the case, bearing in mind that our inquiry is concerned only with the question of whether said official was justified in finding from the contents of that document alone "probable cause" of fraud, not whether fraud was actually present.

The court then held that the circumstances surrounding the importation, as set forth in the letter, were sufficient to warrant a finding of probable cause of fraud and that the collector's reliquidation was authorized by the statute and was timely.

The statute itself says nothing about actual fraud, but provides that if the collector finds probable cause to believe there is fraud, he may reliquidate within 2 years. The section carries no penalty, but merely extends the period during which the collector may reliquidate. This procedure serves to protect the Government in the event that it has been deprived of its just revenue, but the importer still has his right to challenge the correctness of the reliquidation by way of protest. There appears to be no reason for requiring the Government to prove actual fraud when the only prerequisite in the statute is that the collector find probable cause to believe there is fraud in the case.

The record presented here establishes that the collector had probable cause to believe there was fraud, and that the entries were made on the basis of low weights, known to the importer to be false, and, to its knowledge, relied upon by customs officials to the detriment of the revenue of the United States.

We find, therefore, that the collector's reliquidations under section 521, *supra*, were justified.

The next question involves the correctness of these reliquidations. On this point, Deputy Collector Dolgner testified that, in each of the entries, he assessed duty upon the basis of a weight which was 23 percent more than the entered weight. He obtained these weights from a compilation submitted as attachment 9 to the customs agent's report (defendant's collective exhibit A). He stated that this compilation listed, among other things, the quantities originally entered, the weights taken from other exhibits which were part of the report, and the comparable weights, multiplied by 123 percent.

According to Customs Agent O'Hearn, attachment 9 was prepared under his supervision and was based on documents of the B.C. Cooperative received from Mr. Taylor, the weights shown on the fish tickets, and statements made by Mr. Kjell Dahl. It was exhibited to Mr. Taylor and checked by him for accuracy as far as his records were concerned. Furthermore, Mr. Taylor testified at the trial that while he could estimate the weights of fish within 10 percent of accuracy, or better, in connection with these entries, he had taken a random guess. Mr. Dahl admitted that the estimates were a guess within 10 or 15 percent.

The importer claims, nevertheless, that the entered weights in the main more accurately reflect the actual weight of the fish than do the reliquidated weights. In support of its position, the importer produced reports prepared by Ralph W. Young, C.P.A., purporting to show the actual weights of the fish involved herein (plaintiffs' exhibits 1, 2, and 3). Mr. Young testified at the trial that he made a record of all the entries made at Blaine from the papers in the broker's office; that he compared the entry numbers with the fish tickets, as a result of which he was able to determine entry by entry whether or not the weight used in the entry was over, under, or the same as the actual weight. He found the total declared weight to be 2,959,711 pounds and the total fish ticket weight to be 3,036,021 pounds, and underdeclared weight of 76,310 pounds. He also found that there were 96,326 pounds of fish that were spoiled or dumped, so that duty was paid on 20,016 pounds more than the actual, usable fish which came into this country. He admitted, however, that he had never seen the fish, but read on someone's paper "spoiled fish."

He stated that Mr. Hull's analysis, on the basis of which $1,021.92 additional duty had been paid, was incomplete as he had not taken into consideration all of the fish tickets.

Mr. Young stated that the fish tickets he used in making his analysis were those at the Dahl Fish Company, but that he never saw the triplicate or carbon copy that was in Mr. Taylor's possession. He

was shown the copy of State of Washington fish ticket No. A 461 contained in defendant's collective exhibit B and the one contained in defendant's collective exhibit D, designated State's copy. He said that the latter showed 10,800 pounds which was the figure he used. He did not use the weight of 12,810 pounds which appears on the other copy as he did not see that copy.

Thus, the reports of both Mr. Hull and Mr. Young show that fish in a greater quantity than entered was imported, although Mr. Young attempted to offset the underdeclared quantity by a quantity alleged to have been shortshipped or dumped.

It is well settled that the actual weight of the merchandise must be taken as a basis for determining duties, irrespective of the weight given in the invoice. *Downing & Co.* v. *United States,* 11 Ct. Cust. Appls. 310, T.D. 39128. While it is the duty of the collector to ascertain the weight of the merchandise, his failure to do so does not preclude the importer from showing the true weight thereof, nor does it bar the Government from showing the same or from controverting the importer's evidence on that point. *Gertzen & Co.* v. *United States,* 12 Ct. Cust. Appls. 499, T.D. 40697. The method of ascertaining weight and the weights officially reported by customs officials are presumed to be correct, but this presumption is not conclusive and may be rebutted by evidence to the contrary. *United States* v. *Gage Bros.,* 1 Ct. Cust. Appls. 439, T.D. 31503; *Sears, Roebuck & Co.* v. *United States,* 3 Ct. Cust. Appls. 447, T.D. 33035. The burden of proof rests upon the importer to establish by a preponderance of evidence not only that the weights found by the Government are incorrect but also what the correct landed weights actually are. *Draper & Co., Inc.* v. *United States,* 28 Cust. Ct. 136, C.D. 1400; *Resolute Paper Products Corp.* v. *United States,* 31 Cust. Ct. 285, Abstract 57595.

The record in the instant case discloses a number of different weights. The invoiced and entered weights are concededly estimates and not the actual landed weights of the fish. While a few truckloads of fish were weighed in Vancouver, the only actual weighing of the fish took place at the Dahl Fish Company in Bellingham. The only evidence of the weights so obtained consists of copies of the State of Washington fish tickets (defendant's collective exhibits B and D). However, an examination of these tickets discloses that the weight given on the State's copy does not always agree with that given on the fisherman's copy. Notations on some of the fisherman's copies (defendant's collective exhibit B) indicate that a greater quantity of fish was received and paid for than was shown on the State's copies. Even assuming that the Fisherman's copies (defendant's collective exhibit B) show the correct weight of the fish, they

are insufficient to establish the actual landed weight of all the merchandise involved herein, since they do not cover all of the entries.

On the record presented, we hold that the importer has failed to meet its burden of establishing the correct weight of the merchandise. Therefore, the collector's reliquidations of the entries, based on weights determined by the customs agent after investigation, must stand.

On the record presented, we hold that the reliquidations of entries No. 449214, 449454, 449494, 759207, 759211, 759224, 759559, and 759918, covered by protest No. 305870–K, are illegal and void since made more than 2 years after the dates of the original liquidations. As to these entries, protest 305870–K is sustained and the collector will be directed to refund the increased duties taken under the invalid reliquidations. As to all other entries, the protests are overruled.

Judgment will be rendered accordingly.

### CONCURRING OPINION

DONLON, Judge: I concur in the result.

I would, however, rule for plaintiffs on their motion to strike the State of Washington fish receiving tickets (exhibit D) from the record. Acting Collector Dolgner testified that certain of the State of Washington fish receiving tickets were not in the folder he received from Customs Agent O'Hearn prior to reliquidation (R. 9, 10), and counsel for defendant and for plaintiff stipulated that the State of Washington fish receiving tickets of exhibit D were "not before Mr. Dolgner at the time he made his reliquidations." (R. 131.)

What the collector may have learned *after* reliquidation, either from fish receiving tickets or otherwise, is not competent evidence in support of his finding made as of the date of reliquidation.

Plaintiffs' motion to strike exhibit D should be granted.